[L. A. No. 14662. In Bank.—February 28, 1936.]

MAX FACTOR & CO. (a Corporation) et al., Appellants, v. CLARENCE G. KUNSMAN, Respondent.

448

Henry Haves, Sloss & Turner and Sloss, Turner & Finney for Appellants.

Travers, Landels, Weigel & Crocker, Stanley A. Weigel and George N. Crocker, as *Amici Curiae* on Behalf of Appellants.

Jules C. Goldstone, William Berger, John H. Tracy, Bart F. Wade and Paul J. Ziegler for Respondent.

Loeb, Walker & Loeb and Harry J. Miller, as *Amici Curiae* on Behalf of Respondent.

WASTE, C. J.—This case presents an attack upon the provisions of the "Fair Trade Act" adopted by the legislature in 1931 (Stats. 1931, p. 583, Deering's Gen. Laws, 1931, Act 8782), as amended in 1933 (Stats. 1933, p. 793; Deering's Gen. Laws, Supp. 1933, Act 8782).

Prior to the adoption of these provisions, the legislature adopted an act commonly known as the "Cartwright Act",

in order to promote free competition in commerce, which, among other things, declares it to be unlawful for two or more persons to enter into any combination or contract by which they agree to establish the price of any commodity to the public or consumer, and declares any such combination or contract to be against public policy, and void. (Stats. 1907, p. 984, as amended by Stats. 1909, p. 593; Deering's Gen. Laws, 1931, Act 8702.) The Fair Trade Act departs widely from the restrictive provisions of the Cartwright Act, in that it provides (in section 1) that "no contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade-mark, brand, or name of the producer or owner of such commodity, and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the state of California" by reason of any provision which may be contained in such contract, among others, (1) "that the buyer will not resell such commodity except at the price stipulated by the vendor"; and (2) "that the vendee or producer require in delivery to whom he may resell such commodity to agree that he will not, in turn, resell except at the price stipulated by such vendor or by such vendee." This statute, as originally passed, limits its application to persons who voluntarily enter into such contracts with respect to such resale prices, thus apparently seeking to except such contracts from the application of accepted principles respecting combinations and monopolies restraining trade through price-fixing agreements. The amendment to the Fair Trade Act added in 1933, designated as section 1½, presents the crucial point of this case. It reads as follows: "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

These facts appear from the allegations of the complaint: The plaintiff, Max Factor & Co., a Delaware corporation, engaged in the manufacture of cosmetics and toilet articles manufactured by it under certain adopted and registered trade-marks. These trade-marks have long been used in connection with the manufacture, sale and distribution of the

cosmetics and toilet articles manufactured and sold by the corporation; that the corporation is the sole owner of the business and good-will in the state of California and all the states in the United States connected with the distribution and sale of the articles associated with such trade-marks; that prior to the commencement of this action, Max Factor & Co. transferred and sold to the plaintiff Sales Builders, Inc., the exclusive right and privilege of distributing and selling in the states of the United States, including the state of California, the cosmetics and toilet articles then and thereafter manufactured by Max Factor & Co., and the good-will pertaining thereto, with the right to use the trade-marks, and the sole right to sell and distribute the cosmetics and toilet articles in all these states. Plaintiff Sales Builders, Inc., has ever since been, and is, the sole owner of the exclusive right to sell and distribute in all of the states, including California, all of the cosmetics and toilet articles manufactured by the plaintiff Max Factor & Co., and associated with the use of the trade-marks adopted by Max Factor & Co.

The defendant is, and at the times mentioned has been, the owner, proprietor and operator of a retail drug store situated in the city of Beverly Hills in this state, and was, and now is, engaged in selling at retail to consumers of cosmetics, toilet articles and other merchandise.

For many years there has developed in the drug trade in California the practice of cutting prices, both wholesale and retail, of well-advertised commodities well known to the public, and sold and identified under distinctive trade-marks, brands and names. Such products have been, and are, offered by retail dealers at prices conspicuously lower than the marked or established prices of said commodities as so-called "leaders", for the purpose of creating the impression that other goods of which the prices are not so well known are sold at corresponding reductions, and that all articles dealt in by the particular dealer are sold by him at less than they could be obtained elsewhere. The stores in which these practices are prevalent have become known as "cut-rate drug stores". The complaint here sets out at some length matter relative to the fact that the practice of cutting known and established prices has engendered a condition by which other dealers were forced to meet the cut prices advertised by their competitors, one cut producing another in retaliation, so that ultimately, in a par-

ticular community, well-known articles identified by trade-marks, brands, and names with an established price are offered at prices cut to a point which yields no profit, and in many cases represents a loss. Other alleged evils of the practice are set forth at length. It is also alleged that to remedy this evil the legislature of California has enacted the Fair Trade Act, *supra,* the constitutionality of which act is here sought to be established.

In order to protect itself against the alleged injuries and uneconomic practices described in the complaint, plaintiff Sales Builders, Inc., adopted a system of doing business, as set out in the complaint, under which contracts are entered into between the plaintiff and its wholesale jobbing distributors, and between plaintiff and retail druggists and other persons, firms, or corporations selling the Factor products in the state of California, by the terms of which contracts the distributors are obligated to sell these products only to retailers who will resell the same at specified prices, and who, in turn, have entered into a written contract with the plaintiff Sales Builders, Inc., to sell the Factor products at the specified prices. The prices fixed and established by plaintiff Sales Builders, Inc., in said contracts, it is alleged, are fair and reasonable, and no higher than is required to yield to distributors at wholesale and retail a reasonable compensation for their services. It is also alleged that, as known to defendant, practically all of the wholesale druggists in the state of California have executed these wholesale distributors' contracts, and practically all of the retail druggists in the state of California, including the prominent department stores dealing in cosmetics and toilet articles, have executed the retail distributors' contracts, and are observing and conforming with the terms of the contracts. Price-cutting on products of plaintiff Max Factor & Co. has ceased, and plaintiff Sales Builders, Inc., is enjoying, under the terms of the California Fair Trade Act, a reasonable profit from the sale of its goods, and immunity from destructive and uneconomic price-cutting. The distribution of its goods has been unobstructed, and its business has been greatly benefited.

However, the defendant, a retail distributor of plaintiffs' goods, is engaged in selling such goods at prices conspicuously lower than other retail dealers in the state of California, in many instances at less than the cost of the commodities to the

defendant, with the result that other dealers are forced to meet defendant's price competition by offering plaintiffs' goods for sale at prices competitive with those quoted by defendant. Sales Builders, Inc., upon inauguration of its system of contracts heretofore referred to, tendered to defendant a contract and an opportunity to deal in plaintiffs' goods on the same terms offered to every other retail dealer in the commodity in the state of California. The defendant refused and declined to execute the contract or to conform to the system of distribution employed by Sales Builders, Inc., or to observe the sales price fixed in the contract.

The plaintiff Sales Builders, Inc., declined, and has continued to decline, to sell its commodities to the defendant unless and until the defendant enters into the tendered contract with plaintiffs. Defendant has proceeded, and is proceeding, to carry out the alleged unlawful and wrongful scheme, and, it is alleged, in so doing has been, and is, acting maliciously and without legal justification therefor. In pursuance and as part of the wrongful and unlawful plan and scheme, defendant, unbeknown to plaintiffs, has procured, and continues to procure, commodities manufactured by Max Factor & Co. bearing the trade-marks, brands and names of Max Factor & Co., and has sold, and is now selling, the commodities at prices less than retail sales prices which are being sustained by substantially all of the retail dealers in cosmetics and toilet articles in the state of California. Defendant has been, and now is, engaged in informing retail dealers under contract with plaintiff Sales Builders, Inc., as well as the public generally, of defendant's intention to sell plaintiffs' goods at cut-rate prices, which act and the others in the complaint complained of are unduly influencing retail and wholesale distributors of Max Factor & Co.'s products; and the wholesale and retail distributors have complained that they will be compelled to cancel the contracts with plaintiff Sales Builders, Inc., and to sell the Max Factor & Co. products not in conformity with the terms of the contracts entered into by them, but at prices which will meet those announced by the defendant, and at which prices the defendant sells at retail the Max Factor & Co. products. The result of such cancellation, it is claimed, will be the destruction of the business of plaintiffs and the goodwill pertaining thereto.

It is further alleged that the defendant threatens to, and will, unless restrained by judgment of court, continue to sell and dispose of the products of the plaintiff Max Factor & Co. at retail prices less than the retail sales prices regulated by plaintiffs, the continuance of which acts will produce great and irreparable injury to plaintiffs in that it will be extremely difficult, if not impossible, to ascertain the amount of damage that will afford plaintiffs adequate relief for the loss of sales and the destruction of business of plaintiffs and the goodwill pertaining thereto. For these reasons, plaintiffs seek equitable relief by way of injunction against the wrongs complained of.

To the complaint containing the foregoing allegations, defendant interposed a general demurrer, which the trial court sustained without leave to amend. Judgment was thereupon entered for the defendant, and the plaintiffs have appealed, presenting the single question: ''Is section 1½, added to the Fair Trade Act of the state of California in 1933 (Stats. 1933, p. 793, *supra*), constitutional?''

The title of the Fair Trade Act as passed in 1931 indicates its purpose. It is as follows: ''An act to protect trade-mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trademark, brand or name.'' (Stats. 1931, p. 583.) In its entirety, the act aims at preventing price-cutting of articles sold under a trade or brand name, or under a trade-mark. As amended in 1933 (Stats. 1933, p. 793), section 1½ provides, in order to accomplish the above purpose, that all retailers, whether the goods were originally sold to them under a contract fixing the resale price or not, who have knowledge of such contracts of resale, must sell at not less than the fixed price. It is respondent's main contention that such a statute violates the due process and equal protection clauses of the federal and state constitutions, in that it denies to him the liberty and freedom of contract.

We think there are certain fundamental concepts which are decisive of the present case:

█ 1. In the first place, this court has neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. We recognize that economic and juridical thought is, and for many years has been, divided on the economic question as to the benefits

to the consuming public of free and open competition, and its necessary corollary, price-cutting. The Sherman and Clayton Anti-Trust Acts passed by congress, and the Cartwright Act passed by our state legislature, and many other similar statutes, are indications that the particular legislatures involved, at the time such statutes were passed, were of the view that, from a social standpoint, free and open competition was desirable. The basis of this view is that, in the long run, it is against public interest to allow the manufacturer, producer or distributor to fix the resale price of an article. In recent years, there has developed, in opposition to the above views, the concept that a manufacturer of a trade-marked article that is sold in competition with articles of a similar nature and who has fixed a fair price at which he, as well as his distributor and retailer, can make a fair profit, has a property right in the goodwill towards his product which he has created, and that it is sound public policy to protect that property right against destruction by others who have no interest in it except to use it in a misleading way to deceive the public. The basic theory on which this concept rests is that, from a social standpoint, price-cutting, in the long run, adversely affects the public interest, and that the public will be adequately protected against excessive prices by the ordinary play of fair and honest competition between manufacturers of similar products. This latter protection is found in section 2 of the present act, which prohibits manufacturers contracting between themselves to fix the resale price.

As already indicated, the state legislature, by the adoption of the Cartwright Act, *supra,* adopted in 1907, partially, at least, the first economic policy above discussed. By the enactment of the Fair Trade Act in 1931, as amended in 1933, the state legislature, for reasons known to it and which we must presume were sufficient, has seen fit to attempt to change its former policy, and to adopt the second economic concept above discussed. In so far as the statute involves a mere change in the economic policy of the state, this court has no power or right to interfere. The members of the court may or may not agree with the economic philosophy of the Fair Trade Act, but it is no part of the duty of this court to determine whether the policy embodied in the statute is wise or unwise. It is primarily a legislative and not a judicial func-

tion to determine economic policy. The power of the court is limited to determining whether the subject of the legislation is within the state's power, and if so to determine whether the means adopted to accomplish the result are reasonably designed for that purpose, and have a real and substantial relation to the objects sought to be attained. These principles have frequently been stated by the United States Supreme Court. In the recent case of *Nebbia* v. *New York*, 291 U. S. 502, at page 537 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469], Mr. Justice Roberts, speaking for the majority of the court, said:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' (*Northern Securities Co.* v. *United States*, 193 U. S. 197, 337, 338 [24 Sup. Ct. 436, 48 L. Ed. 679].) And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

In *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157, 160 [33 Sup. Ct. 66, 57 L. Ed. 164], Mr. Justice Holmes stated:

"If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed."

As was said in *In re Lasswell*, 1 Cal. App. (2d) 183, 188 [36 Pac. (2d) 678]:

"It is a salutary doctrine that statutes should be sustained by the courts wherever and whenever this is reasonably pos-

sible. It is the purpose, right and duty of the legislative branch of the government to enact such legislation as it deems desirable and its limitations are natural law and the written Constitutions; the courts have no voice in the policy nor in the wisdom of legislative action; they construe the language of the statute and determine its constitutional status.''

█ 2. In the second place, it must be kept in mind that the present statute is one passed in the exercise of the *state's* police power, and so differs fundamentally from statutes passed by the federal government. The latter is, of course, limited by the powers enumerated in the Constitution, while the states are not subject to such limitation. When the statute is viewed from the standpoint of police power, it is at once apparent that it is not a complete answer to the question of constitutionality to merely point out that the statute restricts a retailer from selling property of a certain class owned by him at prices fixed by himself, and so, of course, restricts his freedom of contract. █ There is no constitutional right to own property, as such, free from regulation. That a state statute deprives a person of a right which he formerly possessed, whether it be a right to go where he pleases, conduct himself as he pleases, or buy what he pleases, or sell what he pleases at prices fixed by himself, does not *per se* brand the statute as unconstitutional. The process of civilization has consisted largely of the gradual regulation of the individual in his liberty of action and ownership of property for the public good. As society has become more complex, the necessity for such regulation has become more acute. Neither the state nor the federal Constitution guarantees any person absolute liberty of action. The liberty guaranteed by our law is a liberty subject to regulation in the public good—an equal liberty rather than an absolute liberty. In *Jacobson* v. *Massachusetts*, 197 U. S. 11, 26 [25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765], this principle is expressed as follows: ''But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to

its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others.''

In holding a state statute constitutional which provided that all employees should be paid in cash and paid semi-monthly, and that such regulation should apply even to existing contracts, the United States Supreme Court, in *Erie R. R. Co.* v. *Williams,* 233 U. S. 685, 699 [34 Sup. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097], stated:

''The legislation having been passed in the exercise of the reserved power of the state, is it valid, notwithstanding it prohibits both the plaintiff and its employees from contracting against its provisions? Plaintiff asserts the negative and attempts to sustain the assertion by a very comprehensive argument in which a number of decisions of this court and of other courts are cited and reviewed. They illustrate by various instances the fundamental and indisputable principle that personal liberty includes the power to make contracts. But liberty of making contracts is subject to conditions in the interest of the public welfare, and which shall prevail—principle or condition—cannot be defined by any precise and universal formula. Each instance of asserted conflict must be determined by itself, and it has been said many times that each act of legislation has the support of the presumption that it is an exercise in the interest of the public. The burden is on him who attacks the legislation, and it is not sustained by declaring a liberty of contract. It can only be sustained by demonstrating that it conflicts with some constitutional restraint or that the public welfare is not subserved by the legislation. The legislature is, in the first instance, the judge of what is necessary for the public welfare, and a judicial review of its judgment is limited. The earnest conflict of serious opinion does not suffice to bring it within the range of judicial cognizance.''

Under its police power, the state, in a proper case, has the power, acting in the interests of the general welfare, to regulate property and contract rights, and this includes, of course, the power to regulate the right of free bargaining.

The fact that a state can lawfully pass a statute requiring free and open competition, such as the Cartwright Act, *supra*, which regulates the rights of a manufacturer or producer, and limits his freedom of contract, indicates this power exists.

The fact that a statute limits the rights of the owner of property, lowers its value, or limits its use, or limits the right of free bargaining in other ways, does not, of itself, determine the validity of the enactment. There are innumerable illustrations of statutes, passed under the police power, which interfere with the right of free bargaining which have been upheld on the theory the regulation is in the public interest. ■ There are limits to this power, of course, but within those limits the legislature is supreme. These limits cannot be fixed by precedent. As the state progresses, the police power, within reason, develops to meet the changing conditions. (*Miller* v. *Board of Public Works*, 195 Cal. 477, 484 [234 Pac. 381, 38 A. L. R. 1479]; *People ex rel.* v. *Associated Oil Co.*, 211 Cal. 93, 100 [294 Pac. 717].)

Many illustrations of the power of the state to regulate, in the public interest, the right of free bargaining could be given. The United States Supreme Court has held that a legislature may (1) fix the charges the owners of grain elevators and warehouses may make (*Munn* v. *Illinois*, 94 U. S. 113 [24 L. Ed. 77]; *Budd* v. *New York*, 143 U. S. 517 [12 Sup. Ct. 468, 36 L. Ed. 247]); (2) fix the charges of insurance companies (*German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389 [34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189]); (3) fix the time within which the services of employees must be paid for and provide for semi-monthly payments of wages, and prohibit contracts varying the times of payment (*Erie R. R. Co.* v. *Williams*, 233 U. S. 685 [34 Sup. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097]); (4) fix the fees chargeable by attorneys appearing for employees before workmen's compensation commissioners (*Yeiser* v. *Dysart*, 267 U. S. 540 [45 Sup. Ct. 399, 69 L. Ed. 775]); (5) fix the rate of pay for overtime work (*Bunting* v. *Oregon*, 243 U. S. 426 [37 Sup. Ct. 435, 61 L. Ed. 830, Ann. Cas. 1918A, 1043]); (6) establish maximum hours of labor for men in certain industries (*Holden* v. *Hardy*, 169 U. S. 366 [18 Sup. Ct. 383, 42 L. Ed. 780]); (7) establish maximum hours of labor for women (*Muller* v. *Oregon*, 208 U. S. 412 [28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957]); *Miller*

v. *Wilson,* 236 U. S. 373 [35 Sup. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829]); (8) prohibit the payment of wages in advance (*Patterson* v. *Bark Eudora,* 190 U. S. 169 [23 Sup. Ct. 821, 47 L. Ed. 1002]); (9) require loaves of bread of only a certain size be sold (*Schmidinger* v. *Chicago,* 226 U. S. 578 [33 Sup. Ct. 182, 57 L. Ed. 364, Ann. Cas. 1914B, 284]); (10) establish maximum rentals (*Block* v. *Hirsh,* 256 U. S. 135 [41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165]; *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170 [41 Sup. Ct. 465, 65 L. Ed. 877]); (11) fix the maximum rate of interest chargeable on loans (*Griffith* v. *Connecticut,* 218 U. S. 563 [31 Sup. Ct. 132, 54 L. Ed. 1151]); (12) regulate the net weight of retail packages (*Armour & Co.* v. *North Dakota,* 240 U. S. 510 [36 Sup. Ct. 440, 60 L. Ed. 771]); (13) declare sales of commodities on margin or for future delivery void (*Booth* v. *Illinois,* 184 U. S. 425 [22 Sup Ct. 425, 46 L. Ed. 623]); (14) forbid unfair competition by charging of lower prices in one locality than those exacted in another (*Central Lumber Co.* v. *South Dakota,* 226 U. S. 157 [33 Sup. Ct. 66, 57 L. Ed. 164]); (15) fix the retail price of milk (*Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]).

In each of the above cases the police power of the state was held broad enough to warrant an interference with free bargaining. As was said by Chief Justice Hughes in *Miller* v. *Wilson, supra,* at page 380, ''As the liberty of contract guaranteed by the Constitution is freedom from arbitrary restraint—not immunity from reasonable regulation to safeguard the public interest—the question is whether the restrictions of the statute have reasonable relation to a proper purpose.''

The police power is no longer limited to measures designed to protect life, safety, health and morals of the citizens, but extends to measures designed to promote the public convenience and the general prosperity (*People ex rel.* v. *Associated Oil Co., supra; Chicago, B. & Q. Ry.* v. *Illinois,* 200 U. S. 561 [26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175]), and includes economic measures regulating competition. (*Northern Securities Co.* v. *United States,* 193 U. S. 197 [24 Sup. Ct. 436, 48 L. Ed. 679]; *Nebbia* v. *New York, supra.*)

■ The above cases conclusively establish that there is no absolute right of free bargaining guaranteed by the Constitution. Since, under the proper circumstances, the right of free bargaining can be, and in the past has been, regulated, it necessarily follows that, in a proper case, this power to regulate free bargaining includes the power to regulate the price. Every one of the cases above cited, and many more that could be cited, illustrate the breadth of the power invested in the state legislature to affect the terms of a business bargain between individuals, and in every case the regulation affected the price. As was said in the Nebbia case, *supra* (p. 532): "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. (*Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77].)"

■ Respondent seriously urges that the legislature can only regulate prices as to those articles "affected with a public interest". There are several answers to this contention. As already pointed out, this statute does not aim primarily at regulating prices, but at protecting the property and contract rights of the manufacturer, producer, distributor and retailer. Moreover, the statute does not attempt to regulate the price of any one article. It may be that when the legislature attempts to regulate the price of a particular commodity, in order to justify classifying that article differently from other commodities, its purchase and sale must affect the public interest. But here the legislation affects an entire class of articles, which class, as will later appear, is reasonably the subject of classification. ■ Another complete answer to this contention is that if the purchase and sale of any one article or entire class of articles is subject to regulation under the police power, for reasons already stated, then its purchase and sale does affect the public interest. This was the exact holding in the Nebbia case, *supra,* where, at pages 533 and 536, it is stated:

"Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. Thus understood, 'affected with a public interest, is the equivalent of 'subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression. . . .

"The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest', and 'clothed with a public use', have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon a proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells."

 3. The next major factor that must be emphasized is that the statute here involved is not solely a price fixing or regulating statute. It is true that the statute permits the producer to fix by contracts with his distributor, and the latter by contracts with retailers, the minimum resale price of the product, and that by section $1\frac{1}{2}$ of the act the minimum price so fixed is made binding on all retailers who have knowledge of the contracts, and in this sense it is a price regulating statute. However, to regulate prices as such was not the main purpose of the statute. The statute only applies to certain articles sold under the trade-name or brand or trademark of the producer. As to such articles, the producer or manufacturer, through advertising or other means, has built up a good-will in connection with the articles, which good-will is a species of property entitled to protection. When the retailer sells such an article to a customer, the article is not sold solely on the reputation of the retailer, but partially, at least, on the reputation built up by the owner of the trademark, brand or trade-name. Moreover, section $1\frac{1}{2}$ comes into operation only when the manufacturer or producer has en-

tered into contracts fixing the resale price. The statute, as its title indicates, by preventing price-cutting, is aimed at protecting these valuable property and contract rights of the manufacturer or producer—rights just as valuable and just as much entitled to protection as the right of the retailer, who is attempting, by exercising his claimed right of freedom of action, to injure the property and contract rights of the manufacturer or producer. The statute, in other words, does not merely prohibit price-cutting in order to regulate prices, but prohibits price-cutting in an attempt to protect the validly acquired rights of others. The common law, without statutory authorization, long recognized that unjustifiable interference with contract rights of others constituted a tort. (*Lumley* v. *Gye*, 2 El. & Bl. 216.) The statute here involved, in a large measure, merely extends that common-law doctrine to the transactions enumerated in the statute.

4. Another important factor that must be kept in mind is that in so far as the Fair Trade Act permits the producer to fix the resale price of his product by contract, the act merely embodies a rule of law well settled in this state. In *Grogan* v. *Chaffee*, 156 Cal. 611 [105 Pac. 745, 27 L. R. A. (N. S.) 395], and in *D. Ghirardelli Co.* v. *Hunsicker*, 164 Cal. 355 [128 Pac. 1041], it was held that as far as articles in intrastate commerce are concerned, without statutory authorization the manufacturer, by contract with a retailer, may fix the resale price. The Fair Trade Act as passed in 1931 merely codifies the rule of those cases, which was partially changed by the Cartwright Act, *supra.*

When the above concepts are applied to section 1½ of the Fair Trade Act, we have no hesitancy in holding that the section is constitutional. The object sought to be attained is clearly within the sphere of state regulation, and the means provided in the statute have a reasonable relation to this object. In our opinion the statute is neither arbitrary nor discriminatory.

California apparently is the first state to have passed a statute containing the provisions found in section 1½ of the Fair Trade Act. New Jersey, in 1916, however, passed a statute that permitted the manufacturer to fix the resale price of a trade-marked article, or article sold under a trade or brand name, by attaching a notice fixing the resale price to the container in which the article was sold. The resale price

so fixed was made binding on all retailers. In *Ingersoll & Bro.* v. *Hahne & Co.*, 88 N. J. Eq. 222 [101 Atl. 1030], Id., 89 N. J. Eq. 332 [108 Atl. 128], the New Jersey court, in two opinions, held the statute constitutional on substantially the same reasoning set forth in this opinion.

Since the oral argument and submission of the cause, respondent has cited a decision of the New York Court of Appeals, in which that court held the New York Fair Trade Act unconstitutional. (*Doubleday, Doran & Co., Inc.,* v. *R. W. Macy & Co., Inc.,* decided January 7, 1936, 269 N. Y. 272 [199 N. E. 409].) Because the New York act was copied almost *verbatim* from the California statute, respondent cites the opinion of the New York court as "strongly persuasive". We are not prepared to share counsel's optimistic view of the weight to be given the decision. While, on first impression, it seems entitled to the importance attached to it by respondent, we are of the view that, upon careful analysis, it loses its persuasive force. A brief discussion of the decision will, we believe, be helpful in throwing in relief some of the highlights of the situation now before this court. For several reasons, the decision of the New York court impresses us as not being in point in the discussion here. It is expressly limited to a declaration that section 2 of the New York act (identical with section 1½ of the California act) is unconstitutional "as applied to the facts set forth", which are different from those of the case now before this court. The plaintiffs in the New York case were Doubleday, Doran and Company, Inc., publishers, and Doubleday, Doran Book Shops, Inc., retailers. The contract mentioned in the decision is one between the publishing corporation and the retailing corporation. Aside from any inference to be drawn from the similarity of names, the opinion states that the two plaintiffs, in reality, were one and the same, for it refers to "the price which they [the plaintiffs] stipulated as a retail price in a *contract between themselves.*" Other language indicates the book shop corporation is merely a subsidiary and agent of the publishing company. Again, the plaintiff publishers sold the books in question to the defendant without exacting or, in so far as appears, attempting to exact, from the buyer any restriction on the price for resale. In other words, the producer of goods placed a retail price upon its product by its own independent action, and voluntarily sold

the goods to a retailer (Macy & Co.) for resale without seeking, or at least obtaining, any agreement by the retailer to observe any retail price. In the action, it seeks to prevent the retailer, to whom it has sold the goods without restrictions, from selling the goods at prices less than those which the producer saw fit to fix, in a contract between it and a subsidiary. The New York court accepts, for the purpose of the decision, the interpretation of the act as covering such situation, and, upon that assumption, and apparently that assumption alone, holds section 2 of the act to be unconstitutional. The plaintiffs in the New York case allege only a single contract purporting to fix the resale prices, and that in a pretended contract made with itself, far different from the factual setup in the Max Factor & Co. case. Here there has been adopted a system of making written contracts, generally between producers and retail distributors, under which the products may and will be sold only to retailers who will resell at specified prices and have entered into contracts with the distributor to so sell such products. Practically all of the wholesale and retail druggists in California have executed such contracts, and are observing them, and the plaintiffs' distributors have refused, and will refuse, to sell such products to wholesalers or retailers who do not enter into such contracts. A contract has been tendered to defendant for execution, but defendant will not enter into the agreement. The plaintiffs therefore decline to sell the commodities to defendant unless the defendant enters into the contract. The defendant, with full knowledge of the system of contracts, and the extent of the execution and compliance with their terms by the trade, has obtained Factor products "unbeknown" to plaintiffs, and is selling them at prices less than the prices fixed by the contracts so extensively entered into by others. These facts serve to vitally differentiate the situation in New York from that here. In place of a single pretended contract made by the producer with itself, we have here a uniform system of contracts applied generally to wholesale and retail distributors in the state. In place of a voluntary sale without restriction by the producer to a retailer, there is here a consistent refusal by the producer or owner to sell to the defendant or to any other buyer who will not agree to maintain resale prices. A retailer who has been given an opportunity to enter into the contract has refused to do so, and,

having obtained goods, not from the producer or owner, but indirectly and without the consent or knowledge of the producer, is engaged in cutting prices of the products. The New York decision does not discuss the fundamental basis and purpose of the legislation represented in the California Fair Trade Act, and does not disclose the ground upon which the section of the New York act, as interpreted for the purpose of the decision, is unconstitutional. We cannot find, in this casual treatment of a constitutional question, sufficient justification for regarding the decision as applicable to the facts here.

■ Respondent also urges that the statute denies equal protection of the laws in that it applies only to articles sold under a trade-mark or trade or brand name, and does not apply to non-trade-marked commodities, and, among trade-marked articles, applies only to those in free and open competition with others of a similar nature. As already pointed out, it is only in reference to those commodities included within the statute that the manufacturer or producer has a property right in the nature of good-will, which, in the public interest, should be protected. Such a classification is reasonable. ■ The exclusion of trade-marked articles not in free and open competition with others of a similar nature is likewise reasonable. By that provision the public is protected from artificially high prices imposed by one with an exclusive market. (See *Borden's Farm Products Co.* v. *Ten Eyck*, 297 U. S. 251 [56 Sup. Ct. 453, 80 L. Ed. ——], decided by the United States Supreme Court, February 10, 1936.)

■ The contention made by the respondent that the Fair Trade Act attempts to regulate interstate commerce, and so is unconstitutional, is without merit. The allegations of the complaint clearly establish that as to the transaction now before the court it is one arising and involving goods wholly located within this state. Although the terms of the statute are broad, and could conceivably be interpreted to include interstate transactions, we must necessarily construe the act as applying only to transactions within the state, that being the sole territorial extent of the legislature's powers. (*California Adjustment Co.* v. *Atchison, T. & S. F. Ry. Co.*, 179 Cal. 140 [175 Pac. 682, 13 A. L. R. 274]; *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347 [29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047].)

 Respondent presents several hypothetical situations under which enforcement of the act would be inequitable or difficult, or, perhaps, even unconstitutional. It is elementary, of course, that a statute may be invalid as applied to one set of facts, yet valid as applied to another. (*Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282 [42 Sup. Ct. 106, 66. L. Ed. 239].) The situations conjured up by respondent are not here involved, and respondent is limited in his attack to the application of the statute to the factual situation now before the court. Moreover, the principal remedy granted by the statute is injunctive relief. The equity court has broad and flexible discretionary powers, and can, and undoubtedly would, deny injunctive relief where such relief would be inequitable.

 It is beyond denial that, under our form of government, the use of property and the making of contracts are normally matters of private concern. Here, no question of impairment of existing contracts is involved. No criminal proceedings have arisen under the circumstances of the case. The plaintiffs are seeking, in a civil action, to restrain conduct on the part of the defendant which the legislature, in determining a question of economic policy, has declared to be "unfair competition, and actionable at the suit of any person damaged thereby". We are of the view that its action, measured by the yardstick of the cases cited, and other authorities of similar import, must be held to be free from constitutional objections, and, not being shown to be unreasonable or arbitrary, it must be sustained as a proper legislative declaration of the policy of the state on the practice of price-cutting. The demurrer of defendant to the complaint should have been overruled.

The judgment entered on the order sustaining the demurrer without leave to amend is reversed; and respondent having filed an election to stand on his demurrer, it is ordered that the trial court enter judgment in the within cause in favor of the appellants as prayed for in the complaint.

Curtis, J., Langdon, J., and Seawell, J., concurred.

THOMPSON, J., Dissenting.—I dissent. I cannot bring myself to agree with the majority opinion in this case. The

question herein is not whether the court or the legislature is authorized to determine the wisdom of an economic policy. It is, of course, elementary that it is beyond the function of the court to attempt to define or limit the economic policy or to determine the wisdom of a chosen course by the state. And it is also fundamental that simply because such determination does not fall within the judicial function it does not follow that it belongs in the legislative field. It may be reserved by the state Constitution to the people, or the state may be prevented from acting by the inhibition of the federal Constitution. The question, then, in this case may be phrased as follows: Has the legislature exceeded its powers as limited by some inhibition of the Constitution in which the people have defined for themselves an economic policy and in which they have set up a safeguard against the infringement by the legislature of some natural right with which they are endowed? If the act in question exceeds the legislative power thus measured, it is likewise beyond the judicial function to sap the inhibition or safeguard of its essential vitality, by construction, in order to accomplish or permit a course of action the court may deem to constitute a wise economic policy. (See opinion of Mr. Justice Burnett in *Ex parte Newman,* 9 Cal. 502, 510, for a comprehensive statement of this principle.) The respondent insists that the section brought under our scrutiny in this cause does do violence to sections 1 and 13 of article I and section 25 of article IV of our state Constitution, as well as the fourteenth amendment to the federal Constitution. It seems to me the argument in this regard is unanswerable. Section 1 of article I reads as follows: "All men are by nature free and independent, and have certain inalienable rights among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property; and pursuing and obtaining safety and happiness." Section 13 of the same article provides that no person shall "be deprived of life, liberty or property without due process of law", which is, of course, in keeping with a portion of the fourteenth amendment to the federal Constitution. Section 25 of article IV forbids the enactment of special laws respecting enumerated subjects or where a general law can be made applicable.

Sections 1 and 13 of the first article have been considered by this court in previous cases, and I believe if the amend-

ment under attack is to be sustained, they must be directly overruled or the court forced to the extent of saying all trademarked goods, including the specific item of cosmetics here involved, have been so devoted to a public use that they have become "affected with a public interest". I can scarcely believe that anyone would adopt the latter alternative. Hence I advert to the construing authorities. It was held in the early case of *Ex parte Newman*, to which I have already referred, that the declaration of principles contained in article I, and which were intended for the protection of every individual, "can be enforced by judicial determination." In *Ex parte Quarg*, 149 Cal. 79 [84 Pac. 766, 117 Am. St. Rep. 115, 9 Ann. Cas. 747, 5 L. R. A. (N. S.) 183], this court proceeded to enforce the section upon which the respondent relies for his protection. With respect to an enactment which attempted to prohibit the sale of theater tickets at a price in excess of that originally charged, it is there said: "The constitutional guaranty securing to every person the right of 'acquiring, possessing and protecting property' refers to the right to acquire and possess the absolute and unqualified title to every species of property recognized by law, with all the rights incidental thereto, and, in connection with the right of personal liberty, *it includes the right to dispose of such property* in such innocent manner as he please, and *to sell it for such price as he can obtain in fair barter*" (italics added). To the same practical effect is *Ex parte Dickey*, 144 Cal. 234 [77 Pac. 924, 103 Am. St. Rep. 82, 1 Ann. Cas. 428, 66 L. R. A. 928], in which we find this expression: "This right of contract common to the followers of all legitimate vocations is an asset of the petitioner in his chosen occupation, and, as has been said, is a part of the property in the enjoyment of which he is guaranteed protection by the Constitution. By the act in question he is arbitrarily stripped of this right of contract, and deprived of his property, and left, in following his vocation and in pursuit of his livelihood, circumscribed and hampered by a law not applicable to his fellow men in other occupations." (See, also, *In re Smith*, 193 Cal. 337 [223 Pac. 971].) Again, in *People* v. *Pace*, 73 Cal. App. 548 [238 Pac. 1089], after approving the language which we have quoted from *Ex parte Quarg, supra*, it was held that the legislature could not require a person to secure a permit as a condition precedent to the

sale of his own stock, although in repeated and successive transactions. The court said: "In these days when the urge is strong upon legislative bodies to extend the paternal arm of government into the realm of economic activities, it is particularly important that courts in the exercise of the particular functions imposed upon them by the Constitution, should scrutinize with care legislation which tends to encroach upon the constitutional guaranties, to the end that the right of the individual to liberty and possession of property shall become, not a mere theory, but shall be maintained as a practical reality. And while it is true that the increasing conflict between the rights of the individual and the general welfare of society presents ofttimes difficult and perplexing problems, nevertheless courts should not and will not permit the violation of those most fundamental rights that underlie our very existence as a nation. (*Dobbins* v. *Los Angeles,* 195 U. S. 223 [49 L. Ed. 169, 25 Sup. Ct. 18], see, also, Rose's U. S. Notes; *Pacific Palisades Assn.* v. *City of Huntington Beach et al.,* 196 Cal. 211 [40 A. L. R. 782, 237 Pac. 538].)"

There are a host of authorities from other jurisdictions which might be cited to the same effect, but for my purposes it will be sufficient to refer to but two. First we find comparable language in the case of *Tyson & Bro.-United Theatre Offices* v. *Banton,* 273 U. S. 418 [47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236], as follows: "In the endeavor to reach a correct conclusion in respect of this inquiry it will be helpful by way of preface to state certain pertinent considerations. The first of these is that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, case of the *State Freight Tax,* 15 Wall. 232, 278 [21 L. Ed. 146] ; and as such, within the protection of the due process of law clauses of the fifth and fourteenth amendments. See *City of Carrollton* v. *Bazzette,* 159 Ill. 284, 294 [31 L. R. A. 522, 42 N. E. 837]."

Second, I refer to *Doubleday, Doran & Co., Inc.,* v. *R. H. Macy & Co., Inc.,* 269 N. Y. 272 [199 N. E. 409], which case involved a practically *verbatim* copy of the section here involved, adopted by the legislature of New York. Bearing in mind that the New York Court of Appeals was the same court which first sustained the New York Milk Control Act (*People* v. *Nebbia,* 262 N. Y. 259 [186 N. E. 694]), which was the subject of judicial inquiry in the case of *Nebbia* v.

*New York,* from which the majority opinion has quoted so extensively, the expressions we find in the case are especially illuminating. It is there said: ''That the States cannot fix the selling price of any and all commodities has been settled. (*Williams* v. *Standard Oil Co.,* 278 U. S. 235 [49 Sup. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596]; *Tyson & Bro.-United Theatre Ticket Offices* v. *Banton,* 273 U. S. 418 [47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236]; *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522 [43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280]; *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490 [37 Sup. Ct. 412, 61 L. Ed. 866, Ann. Cas. 1918A, 955, L. R. A. 1917E, 1196].)

''Books, at least these books, are not 'affected with the public interest' any more than theater tickets. No emergency has yet arisen in literary publications and the business is not such as comes within the class which must submit to rate fixing. Circumstances which cannot be foreseen from one generation to another may arise which will require certain articles to submit to regulatory prices in order that the public may get them at all or get them in a pure and beneficial state. We cannot always express legislative power in exact formulas nor decide a case before it happens. Experience is the mother of teachers. Under the Nebbia case, for instance (*Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]), no one would doubt now that New York state would have the power to get milk to the public somehow if any combination of forces threatened to shut off all supply or to deteriorate that which was supplied. The price might be an element to be considered with other things in such a case. So we thought in *People* v. *Nebbia,* 262 N. Y. 259 [186 N. E. 694], but to fix arbitrarily the price of books by legislation and not by agreement comes within the condemnation of the decisions which have heretofore dealt with like legislation. What the Legislature cannot do directly, it cannot do indirectly, nor does it cease to be a price fixed by the Legislature because that body has clothed the publisher with the power or authority to establish it.'' I think it so fundamental and so well established that the right to sell at any price obtainable by the owner is a part of the property itself and within the protection of the constitutional guaranties that I shall not devote more space to that thought.

However, it must be conceded that there is a factor which takes some kinds of businesses outside of the strict protection of the inhibition, and to an ascertainment or rather statement (because it has heretofore been well explained and adhered to) of that element I now turn. What is it? For the purposes of a ready statement we say that where a business is "affected with a public interest" it is subject to regulatory measures. Just what is meant by the expression is well stated in *Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 535 [43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280], as follows: "Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or Colonial legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and grist mills. (*State* v. *Edwards*, 86 Me. 102 [29 Atl. 947, 41 Am. St. Rep. 528, 25 L. R. A. 504]; *Terminal Taxicab Co.* v. *District of Columbia*, 241 U. S. 252, 254 [36 Sup. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765].)

"(3) Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."

Again it is said therein (p. 536): "In a sense, the public is concerned about all lawful business because it contributes to the prosperity and well being of the people. The public may suffer from high prices or strikes in many trades, but the expression 'clothed with a public interest' as applied to

a business, means more than that the public welfare is affected by continuity or by the price at which a commodity is sold or a service rendered. The circumstances which clothe a particular kind of business with a public interest, in the sense of *Munn* v. *Illinois* and the other cases, must be such as to create a peculiarly close relation between the public and those engaged in it, and raise implications of an affirmative obligation on their part to be reasonable in dealing with the public.''

Making the meaning of the unanimous court still more clear, the author of the opinion says (p. 537) : ''An ordinary producer, manufacturer, or shopkeeper may sell or not sell, as he likes *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, 320 [17 Sup. Ct. 540, 41 L. Ed. 1007] ; *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 256 [36 Sup. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765], and while this feature does not necessarily exclude businesses from the class clothed with a public interest, *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389 [34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189], it usually distinguishes private from *quasi*-public corporations.

''In nearly all the business included under the third head above, the thing which gave the public interest *was the indispensable nature of the service and the exorbitant charges and the arbitrary control to which the public might be subjected without regulation.*'' (Italics added.)

To revert to the case of *Tyson & Bro.-United Theatre Ticket Offices* v. *Banton, supra,* for a moment we find apt language describing the expression as follows (p. 430) : ''The authority to regulate the conduct of a business or to require license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, *Chesapeake & Potomac Tel. Co.* v. *Manning,* 186 U. S. 238, 246 [22 Sup. Ct. 881, 46 L. Ed. 1144], but exists only where the business or the property involved has become 'affected with a public interest'. . . .

''A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business; and

while the word has not always been limited narrowly as strictly denoting 'a right', that synonym more nearly than any other expresses the sense in which it is to be understood.''

It can hardly be denied that the public is interested in the maintenance and continuity of the oil business, particularly as the same relates to the sale of gasoline and lubricating oils. And yet the Supreme Court of the United States denied the power of the legislature to regulate the price in the case of *Williams* v. *Standard Oil Co.*, 278 U. S. 235, 239 [49 Sup. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596], saying in part as follows: "It is settled by recent decisions of this court that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest' . . . By repeated decisions of this court, beginning with *Munn* v. *Illinois*, 94 U. S. 113 [24 L. Ed. 77], that phrase, however it may be characterized, has become the established test by which the legislative power to fix prices of commodities, use of property or services must be measured. As applied in particular instances, its meaning may be considered both from an affirmative and a negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public . . . Negatively, it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance . . .

"In support of the act under review it is urged that gasoline is of widespread use; that enormous quantities of it are sold in the State of Tennessee; and that it has become necessary and indispensable in carrying on commercial and other activities within the State. But we are here concerned with the character of the business, not with its size or the extent to which the commodity is used. Gasoline is one of the ordinary commodities of trade, differing, so far as the question here is affected, in no essential respect from a great variety of other articles commonly bought and sold by merchants and private dealers in the country. The decisions referred to above make it perfectly clear that the business of dealing in

such articles, irrespective of its extent, does not come within the phrase 'affected with a public interest'.'' I might add other authorities in which the legislative power has been denied, but there has never been a departure from the announced principle. Even in the case of *Nebbia* v. *New York, supra,* to which reference has been made, the court justifies its conclusion by the fact that milk was indispensable and that it was easily contaminable; that in order to secure pure and wholesome milk for the public during the emergency which the legislature declared to exist it was necessary for the state to take control. The facts of the case when studied reveal that the comfort claimed to be found by appellant in the opinion does not in truth exist. And here I desire to point out a fallacy involved in the major opinion. The language quoted is taken from cases involving businesses ''affected with a public interest'' as hereinbefore defined, or from authorities dealing with the health or public safety. The result is that the language, lifted from its context and placed in a different setting, takes on a meaning altogether foreign to that which it originally possessed.

Nor can it be seriously contended that the amendment is not a price-fixing statute. It fixes the price indirectly and it has this additional vice, that it leaves the fixed price to the dictates of the producer—in other words, the legislature has, as said in the Doubleday-Doran case, attempted to delegate authority to the producer of a trade-marked article to set the retail price. No one can object to the contract which he may enter into, but to make this contract binding by legislative fiat as to retail price upon persons who are not privy thereto violates every principle guaranteed the individual by the constitutional guaranties. The element of knowledge on the part of the seller is a minor factor, provided very simply by notice on the goods or label. It is manifest that the act here in question was not based upon the public interest, or that the consumer was considered. Its effect is to grant to the producer a privilege and preference unwarranted by the basic law. Not only that—but seeking to justify its enactment upon the theory that it is designed to prevent price-cutting which injures a competitor, it reaches all merchants who, though they may be satisfied with a smaller profit than others engaged in the business, or who by reason of a greater effi-

ciency are able to sell at lower prices and yet make the same profit, are still compelled to exact from the consumer a fixed retail price. It strikes at every merchant alike, regardless of intention, who desires to manage and control his own business. It is thus made perfectly clear that the object of the act is not to prevent unfair competition but to fix prices. Such being its purpose and operation, it falls under the condemnation of cases involving similar efforts, such as *Fairmont Creamery Co.* v. *Minnesota,* 274 U. S. 1 [47 Sup. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163], and other cases already cited.

But the amendment has other fatal defects. A study of the authorities which deal with the regulation of businesses, both those which sustain and those which reject the claim of legislative power, reveals that the question of whether all the surrounding circumstances have operated to change the status of a private business free from legislative regulation into one in which the public has an interest is one for judicial inquiry and determination (*Wolff Packing Co.* v. *Court of Industrial Relations, supra*). But the act here in question attempts to lump all businesses into a common regulatory basket, provided only that the product is trade-marked and is originally in competition.

I have already mentioned the fact that the legislature has attempted to delegate the price-fixing power to the producer or manufacturer. Before concluding, I wish to direct attention to the almost obvious and inescapable fact that there is no authority in the law for such action. A person may not be bound with respect to his property by the action, whim or caprice of another, particularly where the latter is not vested with any official responsibility or duty. The delegation of such power is contrary to the fourteenth amendment to the federal Constitution. (*Washington* v. *Roberge,* 278 U. S. 116 [49 Sup. Ct. 50, 73 L. Ed. 210, 86 A. L. R. 654]; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 [55 Sup. Ct. 241 [79 L. Ed. 446].) Of course, I concede the producer's right to sell or not to sell at his own price, but when his property has been sold and passed into hands not hampered by contractual covenants the producer's control and right therein has altogether ceased. It takes no great amount of imagination to visualize the discriminatory practices and abuses which might be indulged were the power of the producer to establish a fixed retail price upheld.

Since the preparation of the foregoing opinion I have read the dissenting opinion by Mr. Justice Shenk and desire to express my concurrence therein.

The judgment should be affirmed.

SHENK, J., Dissenting.—In concurring in the dissent of Mr. Justice Thompson I desire to comment on certain matters not touched upon in his opinion. In the first place let me point out that the particular statute under attack should not be confused with the Unfair Practices Act of 1935 (Stats. 1935, p. 1546), which denounces unfair competition and so-called piratical trade transactions, and was designed to afford full relief against such abuses on behalf of anyone aggrieved. That act is said to have been passed at the behest of the business interests of the state, including the manufacturer, middleman and retailer. While the validity of that statute has not been passed upon by this court it is enough to say for present purposes that it appears to be a painstaking endeavor by the legislature to combat the abuses which the business interests have deemed unfair practices in the competitive field. It appears to have been designed to permit fair competition to function under its own economic laws.

The act now under attack as originally passed in 1931 was confined to the field of contract in the fixing of prices by agreement as between manufacturer, jobber and retailer, and when so limited no valid objection to it has been pointed out. It is the amendment of 1933 which makes the prices so fixed binding on all who are not parties to the contract. In other words, it places within the power of the manufacturer or producer to fix the retail price of all commodities regardless of their reasonableness. It does not purport to denounce unfair competition alone, but affects fair competition is well. Carried to its length it would enable the manufacturer or producer to destroy all competition and thus place the consumer at their uncontrolled mercy even as to food, clothing and all commodities which are the subject of manufacture or production. This, too, without regard to serious marketing problems which have confronted some of the basic industries of the state. It is said that whether these results should follow is an economic problem with which the courts have nothing to do. But it is the business of the courts to see to it that,

in carrying out any such program, the fundamental and guaranteed rights of the citizen to deal with his property as he chooses, subject to such reasonable regulations as may properly be imposed, are not destroyed. The statute under attack does not regulate. It prohibits. It is essentially a price-fixing statute. To me it is beyond question that the legislature itself could not fix the retail price of all or any commodities not affected with a public interest or clothed with a public use. We are bound by the decisions of the Supreme Court of the United States on that subject, as pointed out in the opinion of Mr. Justice Thompson. If the legislature itself is without power to fix the retail price of such commodities, how, then, can it delegate that power to one who is governed by no power except his own self-interest?

It is said in the majority opinion that the statute under attack is confined to retail prices of trade-marked or branded commodities; that this is a valid classification and that the legislature has the right to single out commodities so marked as a proper subject of preferment. This is not so, for the reason that there is no limitation on the acquisition of trade-marks and brands, except the ingenuity, or lack of it, but aided by prize contests, on the part of the manufacturer or producer in conjuring up names to suit his purposes. He then may acquire an exclusive right to the *name* under sections 3196–3202 of the Political Code. Under this easy plan all commodities, essential or otherwise may be trade-marked or branded. It does not follow that because the right to the use of the name is exclusive, the right to shackle the commodity with a retail price is vested in the owner of the name, regardless of where the commodity may find itself in the channels of trade, divorced from any contractual relation with the owner of the name.

As to the price-fixing feature of the statute the highest court in the land has spoken in terms which I feel bound to respect. Also, the state of New York enacted the same statute now under attack. The highest court of that state recently and correctly held it void under the federal Constitution. In deference to what I deem to be the established law I arrive at the same conclusion.

Rehearing denied.