**Old Fort Dearborn Wine and Liquor Company, Appellee, v. Old Dearborn Distributing Company, Appellant.**

**Gen. No. 38,931.**

Opinion filed November 4, 1936.

IRVING BREAKSTONE and IRVING GREENSPAHN, both of Chicago, for appellant.

MOSES, KENNEDY, STEIN & BACHRACH, of Chicago, for appellee; HAMILTON MOSES, STANLEY MORRIS and R. WEYAND, of Chicago, of counsel.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is an appeal by the defendant from a temporary injunction order entered by the court based upon the bill of complaint filed by the plaintiff, enjoining and restraining the defendant, its employees, representatives, servants, salesmen, clerks, agents and attorneys, pending final hearing or sooner determination of this cause, from directly or indirectly advertising for sale at retail, offering for sale at retail, or selling at retail within the city of Chicago, a certain brand of whiskey distributed by Schenley Distributors, Inc., a New York corporation, said brand bearing trademark and trade name of "Old Quaker," at a price below $1.69 per quart, 89c per pint and 47c per half-pint; and a certain brand of whiskey distributed by said Schenley Distributors, Inc., bearing the trademark and trade name of "Golden Wedding" whiskey,

at a price below $2.49 per quart, $1.29 per pint and 68c per one-half pint.

This order is based upon the verified bill of complaint filed by the plaintiff wherein it is alleged in substance that the plaintiff is a corporation engaged in business in the city of Chicago, Illinois, as a wholesale distributor selling to retailers for resale in that city various brands of liquors and alcoholic beverages of standard quality. The defendant is a retailer, engaged in said city in selling various brands of liquors and alcoholic beverages at retail. The plaintiff sells at wholesale to retailers in said city certain liquors and alcoholic beverages commonly known as "Schenley Products," which it purchases from a New York corporation, Schenley Distributors, Inc., which is licensed to do business in Illinois, and is the sole sales and distributing agent of certain affiliated liquor distilleries known as the Schenley Distilleries; that plaintiff is one of 10 wholesalers of Schenley products in the city of Chicago who are known as "local Schenley distributors." These local Schenley distributors are limited to that number and are the only ones selling Schenley Products at wholesale in the city of Chicago.

It further appears from the bill that the plaintiff has a considerable financial investment in its business, and that an important and valuable asset of its business is the good will of the retailers who purchase Schenley products from the plaintiff, and of the public and consumers who purchase said products in Chicago. The good will has been built up in part by the maintenance of local Schenley distributors and Schenley Distributors, Inc., of a uniform retail price for their products. Schenley products consist of various brands of straight whiskies, blended whiskies, bonded whiskies, gins, brandies, cordials and rums. All of said brands at all times have been and are of standard quality or make. All of said brands are sold in bottles which have affixed thereon a paper label bearing the trade-

mark, duly registered with the United States Patent Office, of the producer of the product and the brand and name of the producer. The brands known as "Old Quaker" and "Golden Wedding," are in fair and open competition with commodities of the same general class sold at retail in said city, produced by persons other than said Schenley Distilleries.

The complaint alleges in some detail the peculiar characteristics of the market in liquor and alcoholic beverages and sets forth the beneficial effects of the maintenance of uniform and standard retail prices fixed at an amount fair and reasonable to manufacturer, distributor and consumer for each brand of Schenley products sold in Chicago, the evils inherent in price cutting, and plaintiff's adherence and that of Schenley Distributors, Inc. to a business policy of securing to consumers the benefit of such prices. The uniform and standard retail price of the brand of whiskey known as "Old Quaker" is $1.69 a quart, 89c per pint and 47c per one-half pint, and "Golden Wedding" $2.49 per quart, $1.29 per pint and 68c per one-half pint. Schenley Distributors, Inc., in accordance with said business policy, suggests to the plaintiff and other local Schenley distributors a minimum retail price for which each of its brands should be sold at retail. In the event that any distributor sells any brand of Schenley products to any retailer who is known by said distributor to sell any brand of Schenley products in Chicago, at less than the uniform retail price suggested, Schenley Distributors, Inc., refuses to sell said products to said distributor.

It is also alleged in the bill of complaint that after the enactment of the Fair Trade Act, the plaintiff to avail itself of the benefits of the act, entered into various contracts with the retailers which contracts with retailers contain a provision that said retailers would not resell said brands except at the prevailing uniform and standard Schenley retail price. During the six

months preceding the institution of suit, all sales of Schenley products made by plaintiff to retailers were made under such contracts. Defendant knew of these contracts at the time it engaged in the conduct hereinafter described. The other local Schenley distributors similarly entered into like contracts with their retailers, and the number of all retailers in Chicago selling under such contracts approximated 85 per cent of all retailers selling Schenley Products in that city. As a result of the foregoing business policy certain beneficial consequences are alleged to have ensued. The plaintiff did not consider it material to describe these at length.

During the month of April, 1936, the defendant threatened to sell, offer for sale and advertise for sale the brand of whiskey known as "Old Quaker" and as "Golden Wedding" at a price lower than the uniform standard Schenley retail price. At the time of making such threats the defendant knew of the existing contracts to maintain the price of said brands. On April 2, 1935, and theretofore, the plaintiff informed the defendant of the business policy of the plaintiff and of its attempts to avail itself of the benefits of the Fair Trade Act by entering into said agreements, and requested the defendant not to sell, offer for sale or advertise for sale at retail in Chicago said brand of "Old Quaker" and said brand of "Golden Wedding" below the uniform price. The plaintiff tendered to the defendant a form of printed agreement which it used in making sales of Schenley products to other retailers. Said form of printed agreement is attached to the complaint as an exhibit. The defendant refused to enter into such an agreement, with the plaintiff.

On April 2, 1936, the defendant sold large quantities of the brand of "Old Quaker" and of "Golden Wedding," the former at 69c per pint (the uniform price of which was then 89c per pint) and the latter at $1.19 per pint (the uniform price of which was then $1.29

per pint); defendant knowing at the time of the various contracts stipulating the uniform retail price. Thereafter the defendant was requested by the plaintiff to cease underselling the uniform price, but the defendant asserted that it would not refrain from so doing. Thereafter the defendant inserted advertisements in the Chicago newspapers advertising retail prices of said brands below the Schenley uniform resale prices. As a result of the defendant's conduct a great number of other retailers located in the vicinity of the defendant's stores threatened to violate their contracts with the plaintiff and to sell and offer for sale said brands of "Old Quaker" and "Golden Wedding" at the price of 69c and $1.19 per pint, respectively or less, in order to meet competition. Several of the retailers did violate their contracts. The sales by said retailers at said price of 69c and $1.19 per pint and below, it is alleged, did not yield said retailers a fair and reasonable profit and some of the retailers began to and did offer to the public substitute brands for "Old Quaker" and "Golden Wedding" when the public called for those brands. The plaintiff consequently suffered great loss and irreparable injury.

The bill further states in substance that all of the quantities of "Old Quaker" and "Golden Wedding" sold by the defendant were purchased by the defendant from various persons within the State of Illinois who kept and had said quantity in said State prior to selling same to said defendant. Said quantity so purchased by the defendant was purchased subsequent to the time when said Fair Trade agreements were entered into by the plaintiff and subsequent to the time that said defendant knew of the standard uniform price for said brand fixed in said agreements. Said whiskey was not dealt in by the defendant for the purpose of or in the course of closing out said quantity for the purpose of discontinuing delivery of said brand nor because said quantity nor any part thereof was

damaged or deteriorated nor on account of or pursuant to an order of court.

The bill further states that unless the defendant is restrained from selling below the uniform minimum price, great and irreparable injury to the plaintiff will result. The injury is specifically set forth. The amount of compensation which would afford relief to the plaintiff is alleged to be difficult of ascertainment, and an injunction is prayed for restraining the defendant from selling the goods below the minimum prices set forth in the bill of complaint.

A hearing was had before the court upon defendant's motion that the plaintiff was not entitled to an injunction and the relief prayed for and that the complaint be dismissed for want of equity, which motion was denied and the court entered the temporary restraining order hereinabove set forth.

Since the filing of the appeal in the instant case the Supreme Court in the case of *Joseph Triner Corp. v. Carl W. McNeil,* Docket No. 23,475, considered the question of the constitutionality of the Illinois Fair Trade Act (Ill. State Bar Stats. 1935, ch. 140, p. 3091; Smith's Stat. 1935, p. 2893) and held that the act did not violate any of the provisions of the Illinois State Constitution.

This conclusion was also approved and followed by the court in the case entitled Seagram-Distillers Corporation v. The Old Dearborn Distributing Company, Docket No. 23531 — April, 1936. The court in the *Triner* case, in passing upon the legality of the Act, said:

". . . We are particularly concerned with section 2, which declares that 'willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair

competition and is actionable at the suit of any person damaged thereby. The third section provides that the act shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or re-sale prices. The Fair Trade Act thus permits vertical re-sale price maintenance, but condemns, as do the Federal and State Anti-trust laws, horizontal arrangements for fixing prices. The act prescribes no criminal penalties."

It follows that the subject to be treated by this court is whether the acts of the defendant violated the provisions of the Illinois Fair Trade Act and were sufficient to justify the granting by the court of the temporary injunction now here on appeal by the defendant.

The defendant raises the point, among others, that the injunctional order by its terms is mandatory, and questions the authority of the trial court to issue this temporary injunction for the reason that the court in doing so considered only the verified bill of complaint, thereby affording the plaintiff all the relief prayed for, whereas the question should have been considered by the court only after a full hearing upon the merits of the controversy.

In support of defendant's position counsel relies largely on the case entitled *Cleaning, etc. Ass'n v. Sterling Cleaners & Dyers,* 278 Ill. App. 70, wherein this court said:

"The effect of the order in the instant case disposes of the question of price for services rendered, and really disposes of the question of merits before a final hearing, the result of which is to grant the plaintiffs the relief sought by their bill. The rule in equity is that the issuance of a temporary injunction, if the allegations of the bill justify it, is for the purpose of maintaining the *status quo* until the merits can be determined upon a final hearing. The court by its order

disposed of the question of the merits of the controversy, and thereby changed the status of the parties.''

The general purpose of an injunctional order is to restrain acts which would destroy the property rights of the person or company damaged. The court has discretion under proper circumstances to enter an order to maintain the *status quo* between the parties until a final hearing is had. In the instant case the facts disclose that the defendant is charged under oath with taking advantage of the established good reputation of plaintiff's products known by the label used, which is a trade-mark emblem.

It is the undoubted right of a manufacturer or wholesaler to maintain a fair price for an article that has back of it the record of good quality, and which is recognized as such by the buying public. This is brought to the attention of the purchaser by the manufacturer's label under which the article is sold. In order to attract the attention of buyers, publicity is necessary. This fact is apparent when it is to be observed on all sides that the merits of an article are extolled and the benefit that may be derived from the use of the advertised article.

The plaintiff sets forth in its bill the established record of goods sold by it, to the merits of which the public is attracted by its label. The customers are familiar with the known quality of the article so sold, and to further protect its rights the label used by the plaintiff bears the legend trade-mark; in other words, the label has been registered under the provisions of the Trade Mark Statute of the United States.

From the pleadings the plaintiff has an established and prosperous business, which is based upon the sale of the goods handled at a price agreed upon by all its agents, wholesale or retail, and by its customers, for the liquor known as ''Golden Wedding'' and ''Old

Quaker'' as charged in this bill. There is no question but that such are bound by the several agreements, but there is the question, can the defendant be controlled by the price fixed by a manufacturer or distributor not a party to any contract. This problem is not a difficult one to decide. The Supreme Court in the *Triner* case makes this pertinent statement:

''Legislatures have long endeavored to promote free competition by laws aimed at trusts and monopolies such as the Anti-trust act of this State, enacted in 1891. (Ill. State Bar Stats. 1935, p. 1235; Smith's Stat. 1935, p. 1201.) It is manifest that when the General Assembly enacted the Fair Trade act in 1935, it was attempting to modify its former policy and to adopt an economic concept which has received widespread popular approval in recent years. The gist of the theory is that the manufacturer of a trade-marked article sold in competition with articles of similar nature, who was designated a fair price at which he, as well as his distributor and retailer, can make a fair profit, has a property right in the good will towards his product which he has created, and that it is sound public policy to protect that property right against destruction by others who have no interest in it except to employ it in a misleading manner for the purpose of deceiving the public. 'The basic theory on which this concept rests' observed the California Supreme Court in *Max Factor & Co. v. Kunsman*, 55 Pac. (2d) 177, 'is that, from a social standpoint, price cutting, in the long run, adversely affects the public interest, and that the public will be adequately protected against excessive prices by the ordinary play of fair and honest competition between manufacturers of similar products.' Section 2 of the California Fair Trade act, as does section 3 of our law, prohibits manufacturers from contracting between themselves to fix re-sale prices.''

It is well to note that the injunctional order does not fix or establish a price for any of the articles sold by the defendant, but relates only to the product of the plaintiff known as such by its trade name. Again, the Supreme Court in the *Triner* case quotes from *Ingersoll & Bro. v. Hahne & Co.,* 88 N. J. Eq. 222, 101 Atl. 1030, as follows:

''The defendant makes use of the name, reputation, and guaranty of complainant for its own ulterior purpose and appropriates to itself the effect of the extensive advertising, upon which the complainant depends, for defendant's own profit, in violation of the contract expressed in the notice, and with no desire to benefit the public. A retailer does not sell a standard article at a loss for eleemosynary purposes,'' and says: ''The injunction granted the complainant was subsequently made permanent in *Ingersoll & Bro. v. Hahne & Co.,* 89 N. J. Eq. 332, 108 Atl. 128. The same jurist in this later case pointed out that, even in the absence of statute, contracts relating to trade and containing restraints are valid if such restraints are reasonable. In particular, the court said: 'It is also well recognized that a person has a property interest in his trade-name and good will, and will, even in the absence of statute, be protected against injury to that trade-name and good will. This right has in this State been as above indicated recognized by statute. . . . In those cases in which the right to fix a re-sale price has been under consideration, the prohibition against the re-sale has been against the re-sale of the article itself. The name or trade-mark or what not has been so much an integral part of the article as that a re-sale of the article without reference to the trade-mark or trade-name would be practically impossible. In the case at bar the prohibition is not against a re-sale of the article, nor is it impracticable to re-sell the article without reference to the trade-name. . . . Complainant

does not seek to retain any right in the article itself; it merely seeks to restrain the use of its trade-name and good will, except under conditions fixed by it. . . ."

The facts that appear from the allegations of the bill of complaint justified the court's order for a temporary injunction so that the *status quo* be maintained between the parties until a final hearing to determine the merits of the controversy.

The conclusion reached by this court is based solely upon the facts as alleged in the bill of complaint, and the application of the law to the facts as herein indicated is not to be taken as an expression of the court upon the merits. The conclusion of the trial court can be reached only upon a final hearing.

One of the contentions of the defendant is that the plaintiff not being a producer or manufacturer is not entitled to invoke the provisions of the Illinois Fair Trade Act and procure a temporary injunction fixing the resale prices of the defendant's merchandise. Upon this question it is well to have in mind the provisions of the Illinois Fair Trade Act of 1935, which act provides in part as follows:

"8. Unfair competition—Trade mark—Provisions against resale—Validity of contract. Section 1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of Illinois by reason of any of the following provisions which may be contained in such contract:

"(1) That the buyer will not resell such commodity except at the price stipulated by the vendor.

"(2) That the producer or vendee of a commodity require upon the sale of such commodity to another,

that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee.

"Such provisions in any contract shall be deemed to contain or imply conditions that such commodity may be resold without reference to such agreement in the following cases:

"(1) In closing out the owner's stock for the purpose of discontinuing delivery of any such commodity; provided, however, that such stock is first offered to the manufacturer of such stock at the original invoice price, at least ten (10) days before such stock shall be offered for sale to the public.

"(2) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(3) By any officer acting under the orders of any court."

Section 2 of the act elsewhere referred to in this opinion relates to wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract, and which provision also binds a person who is not a party to such a contract where he enters into unfair competition.

In construing various provisions of the contract, the Supreme Court in the case of *Seagram-Distillers Corp. v. The Old Dearborn Distributing Co., supra,* makes this statement upon a like question, that is, as to whether or not it would bind a person who had not entered into a contract such as the one we have before us:

"We are not concerned with the claim that the contract between plaintiff and defendant was not executed by the defendant's proper officers or that it is invalid for lack of mutuality. Section 2 of the Fair Trade act applies to wilfully and knowingly advertising, offering for sale or selling any commodity at less than the prices stipulated in any contract entered into pursuant to the

provisions of section 1 of the act, whether the person so doing is or is not a party to such contract.''

As we have already indicated, the defendant is not a party to the contract with the plaintiff in this case, but under the terms of the provisions of the statute, the acts charged in the bill of complaint indicate that the defendant in seeking to sell liquors produced by the plaintiff corporation at a price less than that fixed in the contract between the wholesalers, the distributors and the purchasers, made use of the plaintiff's name and good-will in order to attract the attention of buyers. These acts, as alleged in the bill of complaint, were for the ''purpose of inveigling the public into patronizing their places of business, in the hope of obtaining a profit on other goods of inferior quality. In other words, the reputation of the one is used for the personal advantage of the other.'' *Triner Corp. v. McNeil, supra.*

It is evident from the facts charged in the bill of complaint that the defendant violated certain of the provisions of the Illinois Fair Trade Act of 1935, with the wilful purpose of selling and offering for sale certain commodities bearing the registered label or trade name of the producer, such registration appearing on the face of the label, at a price less than had been established by plaintiff's contracts with its customers, which were entered into under section 1 of the Act in question. Evidently the purpose of the defendant was to take advantage of the plaintiff's property right in the good will and trade-marked article by attracting the public to its business in the hope that sales might be made of other goods of perhaps an inferior quality.

From the facts as they appear in the bill of complaint the court properly entered the order appealed from. Therefore the order is affirmed.

*Order affirmed.*

DENIS E. SULLIVAN, P. J., and HALL, J., concur.