## BURT v. WOOLSULATE, Inc.

No. 6661. Decided March 1, 1944. (146 P. 2d 203.)

Sec. 31 C. J. S. Evidence, Sec. 9. Construction of fair trade laws, note, 128 A. L. R. 1126. See, also, 26 R. C. L. 875.

*Gaylen S. Young*, of Salt Lake City, for appellant.

*Irvine, Skeen & Thurman*, of Salt Lake City, for respondent.

WOLFE, Chief Justice.

Action for breach of contract. The trial court entered judgment of no cause of action and the plaintiff appeals.

By the pleadings and evidence it is established that the plaintiff, John A. Burt, and the defendant, Woolsulate, Inc., entered into a written contract on August 10th, 1942. Under the terms of this contract the plaintiff was engaged for a five-year period as a sales representative to sell the defendant's products, including a product known as Woolsulate rock wool. The contract provided that the plaintiff could purchase Woolsulate from the defendant at a price of $32.50 per ton, f. o. b. the Midvale plant.

The defendant admitted that it refused to sell Woolsulate to the plaintiff at the agreed price or at any price less than $37.50 per ton. In justification of this refusal to sell in accordance with the express provisions of the contract, the defendant alleged that the contract was illegal and unenforceable in that it was in violation of the Fair Trade Act (Title 16A, Ch. 3, U. C. A. 1943) and the Unfair Practices Act (Title 16A, Ch. 4, U. C. A. 1943). The trial court directed a verdict for the defendant and the plaintiff appealed.

We turn first to the defendant's contention that the contract sued upon was in violation of the Fair Trade Act. The preamble of the Act defines it as "An Act to protect trade-mark owners, producers, distributors and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distin-

guishing trade-mark, brand or name, through the use of voluntary contract establishing minimum resale prices and providing for refusal to sell unless such minimum resale prices are observed." Section 16A-3-2 permits the execution of contracts establishing minimum resale prices and provides that such contracts shall not be in violation of law.

For the purpose of taking advantage of the benefits of the Fair Trade Act, the defendant, Woolsulate, Inc., filed a schedule of wholesale prices with the Trade Commission of Utah in conjunction with a sales agreement between the defendant, as the "manufacturer," and one Phil Baker, as "wholesaler." Under this agreement Baker promised to maintain the minimum prices set forth in the said schedule of "wholesale prices." The price of Woolsulate rock wool was listed in this schedule at $37.50 per ton. Defendant contends that this contract and the attached schedule sets the minimum price for which the manufacturer can sell his product to anyone—that under the Fair Trade Act, any contract purporting to sell Woolsulate rock wool for less than $37.50 would be unlawful. This contention is untenable.

The Fair Trade Act was never designed to permit the regulation and control of prices for which the manufacturer or producer could sell his product. The Fair Trade Act does not establish any prices. It merely permits manufacturers who desire to do so to enter into contracts designed to control the prices at which the products of said manufacturer can be resold by the various dealers. It legalizes resale price maintenance contracts. Legislation such as the Utah Fair Trade Act proceeds on the theory that the sale of a product bearing a trade-name or brand for a sum less than the price fixed by the manufacturer who owns the said trade-name or brand is an assault upon the good will of his product. The procedure devised by such legislation was to permit the owner of the trade-mark, brand or name used in connection with the sale of the commodity to establish minimum resale prices. See discussion in *Max Factor & Co.* v. *Kunsman*, 5 Cal. 2d 446, 55 P. 2d 177; *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.*, 299

U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476; and in the following law review articles: Fair Trades Acts, J. A. McLaughlin, 86 Pennsylvania Law Rev. 803; The Fair Trades Acts and The Law of Restrictive Agreements, by Harry Shulman, 49 Yale Law J. 607. The contract sued on was not in violation of the Fair Trade Act.

It is common knowledge that pressure for passage of the Fair Trade Acts did not come from the manufacturers and trade-mark owners, but from the distributors and particularly the retail druggists. Their problem of unfair price cutting applied not only to branded goods, but arose as to unbranded goods as well. As a part of the same movement resort was had to the Unfair Practices Acts. These latter statutes could not standardize prices as the Fair Trades Acts had done, but they did aim at alleviating the hardships of "cut-throat" competition.

The immediate stimuli for the enactment of such acts were in part the rapid rise of chain stores, and in part the general sharpening of competitive practices under pressure of the depression. As stated in an article "Prohibiting Price Discrimination and Sales Below Cost: The State Unfair Practices Acts," 32 Ill. Law Rev. 816:

"One of the practices aimed at by these [Unfair Practices Acts] statutes is that, common in chain stores, of selling at lower prices in one locality than in another and making up losses incurred by profits in other stores. Even more important in the application of anti-discrimination statutes today is the prevention of discrimination sales by manufacturers to customers with unusually strong bargaining power who can force large price concessions. * * *

"On the whole the anti-discrimination provisions of the Unfair Practices Acts seem best fitted to reach manufacturers and producers who, in the past have placed certain retail buyers in preferred competitive positions by giving them special rebates or other price favors. Enforcement at this point can be doubly effective under the 'Little Robinson-Patman Acts' which penalize not only the seller but the buyer who knowingly induces or receives discrimination in price."

It is the contention of the defendant that the contract involved in this action required it to sell Woolsulate to the plaintiff at a price of $32.50, at a time when its general

sales prices to others was $37.50, and that it was therefore in violation of the Utah Unfair Practices Act. Section 16A-4-3 of that Act provides:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade or quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption or resale within the state of Utah and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them; * * *."

The evidence clearly establishes that plaintiff, Burt, was given the right by this contract to purchase Woolsulate for $32.50 per ton and that the price charged to certain other purchasers who were in substantially the same position as Burt was $37.50. But this fact did not in and of itself make the contract with Burt an illegal one. The Unfair Practices Act was not designed to compel manufacturers and producers to sell to everyone at the same price. The fact that the manufacturer sells to one at a price of $37.50 per ton does not make all sales contracts at prices below $37.50 per ton illegal and void. It is not every discrimination in price that is outlawed by the Utah Act, but only those which tend to substantially lessen competition or tend to create a monopoly. Therefore, in addition to showing that Burt obtained by this contract a preferential price, the defendant must show that the effect of preferential price may be to substantially lessen competition or tend to create a monopoly.

There is not sufficient evidence showing that sales to Burt for $32.50 would lessen competition or tend to create a monopoly to warrant a directed verdict. There is no evidence to show that any competitor of Burt was making a complaint. Woolsulate had a limited capacity for producing rock wool—producing possibly 10 tons per day. Sales by Woolsulate's representatives were at least

theoretically directly in competition with salesmen of U. S. Rock Wool Company. There is no evidence to show that the sales representatives of this latter company were injured by the low sales price to Burt. Under the contract between Burt and the defendant, Burt was to sell only at retail and to contractors in Salt Lake County. In such sales Burt was required by the contract (in a resale price maintenance provision) to maintain certain specified minimum prices in both retail and wholesale sales. In this area he could not, therefore, sell for less than the prices which would be charged by all other competitors selling as sales representatives for Woolsulate, Inc. Burt was not in competition with other Woolsulate representatives in northern Utah, for by contract this was to be his exclusive territory. Further he was required in all areas to maintain the minimum resale prices referred to above. While Burt may thus have been able, because of the preferential price given to him, to make a larger profit on sales made by him than other sales agents could make on comparable sales, he was prohibited by the contract from cutting his prices so as to injure other sales representatives. He was bound by the same resale prices as were all other applicators. There is no evidence in the record to show that the lower price to Burt would injure other sales representatives or that it would "substantially lessen competition" or "tend to create a monopoly."

Subsection (b) of Section 16A-4-3 provides that:

"Upon proof being made, at any suit on a complaint under this section, that there has been discrimination in price * * * the burden of rebutting the prima facie case thus made * * * shall be upon the person charged with a violation of this section; * * *."

This, however, can be of no aid to the defendant, for it has no application to this fact situation. It applies only to a "suit on a complaint * * * that there has been discrimination in price."

This clearly is not such a suit. The type of suit contemplated by the subsection above quoted is an action under

Section 16A-4-14 by a third party who seeks to enjoin further price discriminations or to recover damages. In passing it may be well to note that there may be some doubt whether there is sufficient relationship between the fact presumed and the fact proved to make this section constitutional. But at this time we express no opinion on its constitutionality. The contract is not violative of the Unfair Practices Act.

This matter has not been adequately briefed by counsel. Many phases of the case have not been argued at all. It may be that the producer who is guilty of a violation of the Unfair Practices Act and/or the Fair Trade Act is not in position to take advantage of his illegal conduct to avoid liability under a contract which has become unfavorable to him. This opinion should not be construed as deciding that point. What is decided is that there is not sufficient evidence in the record to warrant a directed verdict that this contract is violative of either the Unfair Practices Act or the Fair Trade Act.

Counsel for both parties have argued this case in their briefs as though the only basis for granting the directed verdict was that the contract was illegal and unenforceable under the two acts discussed above. It appears, however, from the record that the motion for the directed ■ verdict also encompassed another ground, to wit: That the defendant was prohibited by law from selling Woolsulate to the plaintiff at any price because of the fact that the full output of the defendant's plant was taken by the Federal Government on priority orders from the War Production Board; that the plaintiff did not present orders carrying priority numbers which would enable defendant to make any sales to him. If defendant were required by the War Production Board to allot its entire output to fill priority orders, then it had a valid excuse for not filling orders presented by the plaintiff and there would thus be no breach of the contract. Plaintiff's assignment of error, that the court erred in directing a verdict, is broad enough to permit consideration of this point. But we have no assist-

ance whatever from counsel in determining whether or not the defendant was prohibited by the War Production Board from filling the plaintiff's orders. In fact, neither brief even mentions it. However, a close examination of the evidence reveals that a directed verdict on this ground would not have been warranted. The failure of counsel adequately to prepare their briefs on appeal in regard to such issues as this throws great additional burden upon the court and is not to be condoned.

From what has been said it necessarily follows that the trial court erred in directing a verdict for the defendant. Since the matter must be reversed and remanded for a new trial, there are other issues presented which should be determined for the guidance of the lower court. These latter issues all relate to the construction of the contract. Paragraph two of the contract provides in part that:

"In the event that under the law governing prices there shall, hereafter, be made a rise in price at which the Woolsulate 'Rock Wool' is being sold, the said John A. Burt agrees that some advance in price shall apply to him, provided he receives the same treatment as any and all other Sales Representatives and/or customers of the said Woolsulate, Inc. and further that in event a decline or drop in price, to other than a proportionate reduction shall be made to said John A. Burt."

This merely provides that if there subsequently be a rise in prices of "Rock Wool," the price to Burt shall rise by the same proportionate amount. The word "provided" meaning only "upon the condition" or "with the understanding." The provision does not mean that Burt is to pay exactly the same price as all other Sales Representatives.

Paragraph 5 of the contract grants Burt the exclusive agency in the territory north of Farmington in Davis County, and all of Weber County. It expressly provides that this shall be his exclusive territory. The contract then provides that:

"In the carrying out of this exclusive agency in said territory, he [Burt] agrees to sell not less than Sixty (60) Tons per quarter of

each year during the life of this contract, and the said corporation agrees to give proper credit, upon its books to his account, for all sales, within the said exclusive territory, that may hereafter come direct to its office or plant from any and all retail or wholesale customers or prospects in such exclusive territory, whether the same shall come through him or in any manner direct to the corporation."

The trial court construed the phrase "proper credit upon its books to his account, for all sales" to mean that Burt was to receive only "volume" credit to aid him in meeting the 60 tons per quarter quota. Plaintiff contends that it should be construed as allowing him a cash commission as well—that he should be given both a sales commission and volume credit on all sales originating in his exclusive territory. We are inclined to construe this provision first, as an agreement on the part of Burt to sell at least 60 tons per quarter. It appears that the phrase "and the corporation agrees to give proper credit," etc., for all sales should be construed as a definition of all transactions that could be considered sales. It provides that all sales within the territory whether they come through Burt or directly to the plant are to be considered sales. Since they are considered sales, Burt was to get credit for them, both volume and cash commission. The sentence following this phrase seems to support this view. It provides that:

"The corporation recognizing that in his work and advertising such sales will naturally originate and therefore during the life of this contract such protection is proposed and agreed to."

Merely giving him volume credit would hardly seem to give him the benefit of the fruits of his work and advertising. However, the matter is not without doubt.

The trial court held that this provision was clear and unambiguous and refused to hear evidence proffered to explain it. Such evidence should have been admitted. Perhaps when further evidence to explain the circumstances under which this contract was executed is taken, the doubt as to the correct construction of this paragraph can be removed. Since the matter must be reversed

because of error in granting a motion for a directed verdict, we deem it advisable to have additioal evidence taken on this latter issue also.

As in the case of *Madsen* v. *Chournos*, 104 Utah 280, 139 P. 2d 225, this case is one where the construction of the contract should only be made in the light of surrounding circumstances. We will not attempt to construe it without the aid of this evidence.

Reversed and remanded for a new trial. Costs to appellants.

LARSON, MOFFAT, McDONOUGH, and WADE, JJ., concur.