301 P.2d 741

**GENERAL ELECTRIC COMPANY,**
Plaintiff and Appellant,

*v.*

**THRIFTY SALES,** Inc., d/b/a Broadway Merchandising Company, a corporation, Defendant and Respondent.

No. 8268.

Supreme Court of Utah.

Sept. 22, 1956.

Sherman P. Lloyd, H. Wright Volker, George L. Nelson, Charles Welch, Jr., Salt Lake City, amici curiae.

E. R. Callister, Jr., Atty. Gen., for the Trade Commission.

## CROCKETT, Justice.

The district court dismissed plaintiff's petition for an injunction against defendant selling its fair-traded products at cut-rates on the ground that the Utah Fair Trade Act [1] is invalid insofar as it applies to persons who have not signed any agreement under the act. Plaintiff appeals, asking us to reverse that ruling and confirm the act as valid.

The facts were agreed upon. Plaintiff (General Electric Company) is a manufacturer and distributor on a national scale of various electrical appliances which it sells to dealers throughout the country, including the state of Utah. They bear the plaintiff's trademark "General (G.E.) Electric" and are in free and open competition with other products of the same general type. Plaintiff annually spends several million dollars in national advertising of its trademark and products. For the stated purpose of protecting the investment it has in its trademark and the good will the public has for its products, plaintiff has entered into written agreements with numer-

Fabian, Clendenin, Moffat & Mabey, Peter W. Billings, Albert J. Colton, Spencer L. Kimball, Sanford H. Kadish, Salt Lake City, for appellant.

George E. Bridwell, Salt Lake City, for respondent.

1. Title 13, Chap. 4, U.C.A.1953.

ous dealers in Utah fixing minimum retail prices at which they shall sell its various products in accordance with authorization under the Fair Trade Act, Sec. 6, which provides that a manufacturer may contract with a dealer for minimum retail sales prices, which prices then become binding upon all dealers within the market area.

Defendant (Thrifty Sales, Inc.) operates a "discount house" in Salt Lake City. It signed no such agreement and has "wilfully and knowingly" continued to advertise and sell such trademarked "fair-traded" items at below the prices agreed upon between manufacturer and other dealers in the area. Such practice is admittedly in direct conflict with the "nonsigner" provision of the Utah Fair Trade law, which provides:

> "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this act, *whether the person so advertising, offering for sale or selling is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby." U.C.A.1953, 13–4–6.

The principal contentions as to unconstitutionality of the Fair Trade Act are (1) that it deprives defendant of its property without due process of law, and (2) that it authorizes price-fixing in contravention of the anti-monopoly and price-fixing provisions of the Utah Constitution.

Defendant argues for the untrammeled right to deal freely with property it has purchased by selling it for any price it is willing to accept, claiming such privilege as part of the property right.[2] Whereas it is plaintiff's position that by unrestrained price cutting, retailers can take unfair advantage of its trademark and tend to destroy the value thereof, and also to ultimately destroy competition in that the big and the ruthless drive out small dealers which in the long run is detrimental to the best interests of business generally and the consuming public; that the act affording protection from such practices is not contrary to the anti-price-fixing and monopoly clause but in actual effect carries out its purpose. In support of the foregoing, the plaintiff, and amicus curiae joining it, present an argument having various facets.

The basic tenet of the plaintiff's support of the act is that it has a property right in its trademark as distinguished from the physical thing, the product. It avers that it has devoted many years to creating and developing superior products, and maintaining their quality, spending millions of dollars in advertising and service to build the

2. New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Tyson & Brother-United Theater Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct 426, 71 L.Ed. 718, 58 A.L.R. 1236.

reputation of the trademark, upon which the whole structure of its business and its potential for successful continuation depend.

The method of operation which plaintiff asserts gives dealers an unfair advantage of its trademark is known as "loss leader" selling. It follows this pattern: The dealer advertises the manufacturer's product (generally nationally advertised trademarked commodities) at prices lower than those set by the manufacturer, and often lower than the cost to the dealer, not in a genuine effort to sell the product at a fair profit, but for his own ulterior purposes, to take what the plaintiff terms a "free ride" on the manufacturer's trademark to the latter's disadvantage for various reasons.

One reason assigned for this is that the uniform price is part of the reputation for high quality of its products, which selling at cut-rates undermines by making them appear "cheap" in the eyes of consumers and not of a quality to justify the plaintiff's standard price, inducing buyers to reason that if one merchant can sell at the cut-rate price, then merchants selling at the fixed price must be making an excessive profit, or that the manufacturer must have set an exorbitant price, or both. Another is "switch selling." That is, the trademark and low price are advertised to lure buyers into the dealer's store to use them as prospects to sell other competitive products of less quality on which the dealer can make a profit, which benefits the dealer, but is of no benefit to the manufacturer.

A more fundamental difficulty is the claim that cut-rate selling can be used to intrude into the control of the manufacturer's business. This is based on the reasoning that cut-rate pricing of such products can be used by retailers to develop monopolies, and that it actually was one of the effective tools of the trusts and combines which were in existence at the time the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note and the Utah antimonopoly provisions were enacted. Using the "loss leader" method to get business, the dealer will absorb losses until competition is eliminated. Inasmuch as only large retailers or chains do enough volume of business to absorb such losses, small dealers are unable to compete and are driven from the field, leaving the large dealers to then gouge consumers with high prices safe from competition. One of the main arguments in favor of fair trade is that it helps small dealers by allowing them to compete with large dealers and chain stores.

A further ramification of cut-rate selling which tends toward giving the retailer leverage in controlling the manufacturer is that it results in actual diminution of the manufacturer's sales and concentration of the outlet for his products in the particular dealer. His selling at cut-rates makes it unprofitable for other retailers to handle the product, so they refuse to do so. This reduces the sales outlets, limiting the sales potential and diminishing the flow of the manufacturer's production, meanwhile in-

creasing the percentage of the manufacturer's product which is handled by the particular cut-rate retailer. This often happens with chain stores or discount houses. The greater the portion of the product they handle, the more the manufacturer becomes subject to their control. E. g., if the dealer gets to handling a relatively high percentage of the manufacturer's product, he can threat to discontinue the line unless the manufacturer reduces **the** price. Under such pressure from the retailer, the manufacturer is compelled either to cheapen his product to meet the dealer's demand as to price, or to curtail his production, which is often not economically feasible, or to close down entirely. Whichever alternative he chooses has a serious detrimental effect upon his business and tends to destroy the value and good will in his trademark.

It is urged that the "loss-leader" operation is obviously not sound in that it gives no fair return for doing business on such products and therefore cannot be used as a basis for doing a healthy business; and that by destroying competition, and permitting the retailer to exercise control, it has a bad effect upon business generally, and the consuming public.[3]

It was during the economic depression of the early 1930's, when there was a widespread belief that the "loss leader" tactics of certain retailers threatened the economic well-being of the nation, that legislatures moved to alleviate the evils just referred to by passing Fair Trade Acts. This stated purpose was to permit manufacturers to protect the value and good will of trademarks and trade names, assure a reasonable margin of profit, stabilize production of manufacturers and to prevent large cut-rate retailers from gaining monopolistic control of such business.

California adopted the first Fair Trade Act in 1931.[4] When it was claimed that the act was unworkable if limited to those who signed it was amended in 1933 to apply to nonsigners.[5] Most other states of the Union followed suit within a few years.[6] The

3. Brandeis, "Cutthroat Competition—The Competition that Kills," Harper's Weekly, Nov. 15, 1913: "The competition attained by prohibiting the producer of a trademarked article from maintaining his established price offers nothing substantial. Such competition is superficial merely * * *. It is powerless to prevent the great corporation with ample capital, a perfected organization and a large volume of business, can establish its own agencies or sell direct to the consumer, and is in no danger of having its business destroyed by price-cutting among retailers. But the prohibition of price-maintenance imposes upon the small and dependent producers a serious handicap * * *. Americans should be under no illusions as to the value or effect of price-cutting. It has been the most potent weapon of monopoly—a means of killing the small rival to which the great trusts have resorted most frequently * * *. Far-seeing organized capital secured by this means the cooperation of the short-sighted unorganized consumer to his own undoing * * *."

4. Ch. 278, Cal.Stat.1931, West's Ann.Bus. & Prof.Code, § 16900 et seq.

5. Ch. 260, Cal.Stat.1933.

6. All states except Texas, Vermont and Missouri have passed Fair Trade Acts.

Utah Act, passed in 1937, is patterned after the California and other Fair Trade Acts.

The California Act and a similar one in Illinois, were upheld against attack as to their constitutionality by their respective Supreme Courts in 1936.[7] These decisions were affirmed by the Supreme Court of the United States in the landmark case of Old Dearborn Distributing Co. v. Seagram Distillers Corp.,[8] in which Justice Sutherland, speaking for the unanimous court, held (1) that the act does not have the effect of taking property without due process of law because its primary purpose is to protect a property right which is entitled to protection, namely, the good will of the manufacturer in his trademark, which he owns, and which he retains when he sells the commodity, (2) that the retailer is not deprived of his property without due process of law in being denied the privilege of setting the retail price himself because the restriction is on the property when he acquires it, and he takes it with knowledge thereof, (3) that it does not permit an unlawful delegation of power to private persons to control the disposition of property of others, but rather, only permits the trademark owner to contract for its protection, (4) that the act is neither so vague nor indefinite, nor so arbitrary, unfair or unreasonable as to violate due process, and (5) does not confer discriminatory privileges upon the manufacturer of trademarked goods because the "equal protection" clause permits reasonable classification upon differences which have a fair and substantial relationship to the purposes of the act.

Much of such business being involved in interstate commerce, the Federal Congress took cognizance of the contention that there should be some method for the protection of trademarks and passed the Miller-Tydings Act of 1937, 15 U.S.C.A. § 1 exempting fair-trade contracts from Federal Antitrust Laws. In Schwegmann Bros. v. Calvert Distillers Corp.,[9] the U. S. Supreme Court held that it did not provide such exemption as to nonsigners. Congress conducted extensive investigations and hearings were held by five of its committees, thoroughly considering all of the arguments pro and con with respect to the merit of Fair Trade Acts, their purpose and accomplishment and thereafter with only a few dissenting votes in both House and Senate, passed the McGuire Act [10] to remedy the defect and make valid the nonsigner provisions of such acts, supervening the decision in the Schwegmann case. In a second Schweg-

7. Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177; Joseph Triner Corp. v. McNeil, 363 Ill. 559, 2 N.E.2d 929, 104 A.L.R. 1435.

8. 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109.
9. 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035.
10. 15 U.S.C.A. § 45; Ch. 745, Public Law 542, 66 Stat. 632.

332

mann case,[11] the constitutionality of the McGuire Act was challenged. The Fifth Circuit Court failed to find any federal due process inhibitions against such provisions and the U. S. Supreme Court denied certiorari.

■ There does not appear to be any change in the position of the United States Supreme Court. In the recent case of United States v. McKesson & Robbins, Inc.[12] no question was raised, nor doubt expressed as to the validity of the "vertical" trade agreements. The challenge was based upon the proposition that, in addition to being manufacturer and distributor, McKesson also operates retail stores. The court stated that both the Miller-Tydings and the McGuire Acts expressly continue the prohibitions of the Sherman Act against "horizontal" price fixing, that is, by those in competition with each other on the same functional level, pointing out the distinction between such agreements and the "vertical" agreements, i.e. between manufacturer and retailer, which have heretofore been approved under the act. The McKesson agreements with retailers were held invalid because the company was actually in retail competition with them and were therefore not within the "vertical" exceptions carved out of the Sherman Anti-Trust Act. Since the Federal, Amend. 14, and our Utah State, art. 1, § 7, Constitutions are substantially similar insofar as the due process clauses are concerned, it is proper for us to look to the federal adjudications as helpful and persuasive in the interpretation of our provision.[13]

In addition to the U. S. Supreme Court, in 17 of our sister states, the courts of last resort, against every variety of objection as to constitutionality, have upheld such acts,[14] following generally the rationale of the Old Dearborn case. These courts reason

11. Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co., 5 Cir., 205 F.2d 788, certiorari denied 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369, rehearing denied 346 U.S. 905, 74 S.Ct. 217, 98 L.Ed. 404.
12. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937.
13. Untermyer v. State Tax Comm., 102 Utah 214, 129 P.2d 881.
14. Calif., Max Factor & Co. v. Kunsman, 1936, 5 Cal.2d 446, 55 P.2d 177, Scovill Mfg. Co. v. Skaggs Pay Less Drug Stores, 1955, 45 Cal.2d 881, 291 P.2d 936; Connecticut, Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Co., 1942, 128 Conn. 596, 24 A.2d 841; Delaware, Klein v. National Pressure Cooker Co., 1949, 31 Del.Ch. 459, 64 A.2d 529, General Electric Co. v. Klein, Del.1954, 106 A.2d 206; Illinois, Seagram-Distillers Corp. v. Old Dearborn Dist. Co., 1936, 363 Ill. 610, 2 N.E.2d 940, Joseph Triner Corp. v. McNeil, 1936, 363 Ill. 559, 2 N.E.2d 929, 104 A.L.R. 1435; Iowa, Barron Motors, Inc., v. May's Drug Stores, 1940, 227 Iowa 1344, 291 N.W. 152, Iowa Pharmaceutical Ass'n v. May's Drug Stores, 1940, 229 Iowa 554, 294 N. W. 756; Maryland, Goldsmith v. Mead Johnson & Co., 1939, 176 Md. 682, 7 A. 2d 176, Home Utilities Co. v. Revere Copper & Brass, Md.1956, 122 A.2d 109; Massachusetts General Electric Co. v. Kimball Jewelers, Mass.1956, 132 N.E 2d 652; Mississippi, W. A. Sheaffer Pen Co. v. Barrett, Miss.1950, 45 So.2d 838;

that their respective legislatures could conceive it to be a legitimate purpose of government and therefore within the legislative function to enact laws calculated to provide an economic environment hospitable to business; that the authorization of price maintenance contracts would tend to serve that purpose by protecting trademarks and by fostering competition which is necessary to sound business in that it makes generally for good service, high quality and low cost. They recognize that the property right which the manufacturer has in the trademark itself is just as important and as much entitled to protection as is the claimed right of the dealer to sell a product he has purchased for any price he is willing to accept. The California Supreme Court observed:

"The statute, * * * is aimed at protecting these valuable property and contract rights of the manufacturer or producer—rights just as valuable and just as much entitled to protection

as the right of the retailer, who is attempting, by exercising his claimed right of freedom of action, to injure the property and contract rights of the manufacturer * * *." [15]

Notwithstanding the merit of the reasoning in support of the Fair Trade Acts based on recognition of property rights in the trade-mark itself, and the persuasive arguments in support of the proposition that they deserve some protection from unscrupulous dealers, we are under the necessity of examining the act in a somewhat different light than any of the authorities heretofore referred to.

The consideration of critical moment devolves upon the particular wording of Article XII, Sec. 20 of the Utah Constitution:

*"Trusts and combinations prohibited.*

*"Any combination* by individuals, corporations, or associations, *having for its object or effect the controlling*

New Jersey, Johnson & Johnson v. Weissbard, 1937, 121 N.J.Eq. 585, 191 A. 573, General Electric v. Packard Bamberger & Co., 1953, 14 N.J. 209, 102 A.2d 18; New York, Bourjois Sales Corp. v. Dorfman, 1937, 273 N.Y. 167, 7 N.E.2d 30, 110 A.L.R. 1411, General Electric v. Masters, 1954, 307 N.Y. 229, 120 N.E.2d 802; North Carolina, Ely Lilly & Co. v. Saunders, 1939, 216 N.C. 163, 4 S.E. 2d 528, 125 A.L.R. 1308; Ohio, Union Carbide & Carbon Corp. v. Bargain Fair, Ohio Com.Pl.1955, 130 N.E.2d 255; Pennsylvania, Burche Co. v. General Electric, 1955, 382 Pa. 370, 115 A.2d 361;

South Dakota, Miles Laboratories v. Owl Drug Co., 1940, 67 S.D. 523, 295 N.W. 292; Tennessee, Frankfort Distillers Corp. v. Liberto, 1950, 190 Tenn. 478, 230 S.W.2d 971, Seagram Distillers v. Corenswet, Tenn.1955, 281 S.W.2d 657; Washington, Sears v. Western Thrift Stores of Olympia, Wash.1940, 116 P.2d 756; Wisconsin, Weco Products Co. v. Reed Drug Co., 1937, 225 Wis. 474, 274 N.W. 426; Bulova Watch Co. v. Anderson, 1955, 270 Wis. 21, 70 N.W.2d 243.
15. Max Factor & Co. v. Kunsman, 5 Cal. 2d 446, 55 P.2d 177, 185.

*of the price* of any products of the soil, or *of any article of manufacture* or commerce, or the cost of exchange or transportation, is prohibited, and hereby declared unlawful, and against public policy. * * * "

■ Plaintiff maintains that in order to give this provision proper meaning and effect it is necessary to look to the purpose and intent of the framers. It relies on judicial declarations that literal wording should not be adhered to if application of their ordinary meaning would defeat the plain purpose of the provision, and that wording is subservient to intent,[16] particularly in expounding constitutional principles, because the basic law should be more flexible than statutory law, which is more readily changed.[17] These principles are acknowledged, as is the fact that language has its limitations and is not a perfect medium to record and convey thought, so that under certain circumstances it is necessary to look back of apparent meanings to give effect to the true purpose of the law.

In that connection it is also only fair to observe that there is merit in plaintiff's observation that the discussions at our Constitutional Convention seem to manifest that the antimonopoly provision was directed at the type of combination or trust which had been in use prior to that time and at which the Sherman Anti-Trust Act was aimed.[18] These combinations were formed by those in the same business to fix prices. Dealers who refused to fall in line were first driven from the field by ruthless price cutting in their area, after which those in the combine increased prices and proceeded to exploit the public at higher prices free from competition. Plaintiffs argue that the constitutional provision was aimed at that type of combine and its abuses, and that while the Fair Trade Act, viewed superficially, may seem to allow price fixing, if thought through as to operation and effect, is actually consonant with the constitutional provision and purposed toward the same objective. And in support thereof makes the following points:

(a) That it is not a price-fixing act in that no attempt is made to prescribe prices, but on the contrary, it expressly prohibits price fixing between those retailers, or dealers in direct competition with each other [19] on the same functional level, which have been classified as "horizontal" agreements to fix prices, allowing only those

16. Norville v. State Tax Comm., 98 Utah 170, 97 P.2d 937, 126 A.L.R. 1318; Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

17. See Riggins v. District Court, 89 Utah 183, 201, 51 P.2d 645.

18. See Speech of Delegate Roberts, II Proceedings of Convention, pp. 1553, 1678–1680, and of Delegate Kimball ibid. p. 1821.

19. Sec. 13-4-7, U.C.A.1953.

agreements between the manufacturer and those handling the product in a straight line down to and including the retailer, which have been denominated "vertical" agreements.[20]

(b) That it is in fact the public which sets the price because the product must be in free and open competition with other products of the same general character and if the manufacturer prices his product too high, he will price it out of the market.

(c) That the retailer is free to sell competing lines of goods which must be available and in competition or the act does not apply.

(d) That the dealer must kuow of the price-limiting contract or he cannot be proceeded against under the act.[21]

(e) That if the trademark, brand or name is removed or obliterated the retailer may sell the product at any price he desires.[22] Thus, if he separates the physical property, which he owns, from the good will in the trademark which is the property of the manufacturer, so that he is not relying on or exploiting it, he can sell the product at any price he is willing to accept. This indicates that the restriction is not on the price of the commodity, but is upon the price of the use of the trademark; and

if the dealer relies on the latter for his sale, he should be bound to use it consistent with the contractual obligation to protect the rights of the manufacturer therein, and not to exploit it for his own purpose and to the injury of the manufacturer.[23]

(f) In order to avoid hardships which a rigid statute might impose, it provides for exemptions of bona fide close-out sales, where goods are altered, secondhand or damaged, or sold at judicial sale.[24]

It is upon the basis of the foregoing arguments that plaintiff insists that the act is not in contravention of the spirit and intent of the antiprice-fixing and monopoly laws of our Constitution; that it simply permits manufacturers to enter into agreements for the purpose of protecting property rights in their trademarks against unfair business practices which would tend to destroy the value therein, and to insure competition under reasonable regulations and the benefits that flow therefrom; that both the retailer and the public are amply protected; and that the constitutional provision, obviously aimed at preventing private combinations from indulging in price fixing for monopolistic purposes, was not intended to prevent the legislature from enacting laws authorizing agreements for the wholesome purposes set forth above.

---

20. See Ely Lilly & Co. v. Saunders, 1939, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308, for a clear statement of this distinction.

21. Sec. 13–4–6, U.C.A.1953.

22. Sec. 13–4–5, U.C.A.1953.

23. Joseph Triner Corporation. v. McNeil, footnote 7, supra.

24. Sec. 13–4–5, U.C.A.1953.

The arguments that the intent and purpose of the Fair Trade Law are in harmony with the antiprice-fixing and monopoly provision of our Constitution are indeed plausible, and the authorities holding such acts valid are eminent and impressive. We have no difficulty in agreeing with them in recognizing a property right in the trademark, nor that the manufacturer is entitled to contract for its protection, nor that doing so does not deprive the retailer who so contracts of his property without due process of law. But, as noted above, due to the specific language of our constitutional provision, the defendant's second point of attack: that the act authorizes price fixing in contravention thereof, poses for us a problem of somewhat different character than considered in most of those authorities.

There is a significant difference between the adjudications of the United States Supreme Court and the instant case. The federal antitrust laws were only acts of Congress, which may readily be modified by subsequent enactments; whereas our antiprice-fixing provision is in our Constitution, which must prevail over any statutory enactment inconsistent therewith, however laudable or desirable, or however wise or even necessary for the public welfare such legislation may seem.[25] The Federal Congress, under the urging of supporters of the Fair Trade Acts, deemed it necessary to pass the Miller-Tydings aud later, the McGuire Acts, to legalize fair trade as exceptions to the federal antitrust laws. If this was in fact necessary, and the history of such legislation strongly suggests that it was,[26] and further, if the antimonopoly provision of our Utah Constitution is equivalent to the Sherman Act, it would seem that mere legislative enactment would not carve out any exception to it, but that it would have to be done by constitutional amendment.

Further implementing the argument that we should look back of the ordinary import of the words to see the real intent of the constitutional provision and the effect of the Fair Trade Act as carrying it out, plaintiff cites authorities to the effect that the court will not set itself up as a super legislature and pass upon the wisdom or propriety of the enactment if it is fairly debatable as to whether the judgment of the legislature is well calculated to its purpose,[27] which we do not question under

25. The provisions of the Utah Constitution are "mandatory and prohibitory", see Article I, Sec. 26.
26. See, e. g., Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, in which, prior to Miller-Tydings Act, it was held that contracts between manufacturers and wholesale and retail merchants for uniform prices amounted to unlawful restraint of trade, and insofar as interstate commerce was affected, in violation of Sherman Anti-trust Act.
27. Schwegmann Bros. v. Eli Lilly & Co., supra.

proper circumstances. But here the foundation upon which we work is the Constitition. It is indeed not our prerogative to become a super legislature. Much less should we become a super constitutional convention, and because of policy considerations which plaintiff urges upon us, disregard the language of that document [28] and impose an interpretation as to what they may secretly have intended or ought to have done as now divined by plaintiff.

It is only by a circuitous process of rationalization involving the use of the so-called "vertical" arrangement, that a plausible basis can be found to get around the wording of our constitutional provision. It is doubtful that such an interpretation could be accepted in any event. At the very least, before adopting an interpretation which would bring about such an anomalous result, there would have to appear cogent and persuasive reasons to demonstrate that the real intent was something other than the ordinary meaning of the words used, a circumstance that we do not find present here.

Instead of any degree of certainty, grave doubt exists as to whether the Fair Trade Act tends toward accomplishment of the purposes plaintiff claims for it.[29] Defendant insists that if the superficialities which are purveyed as justifications for the act are unmasked, that it is revealed to be a specious pretext for price fixing and the elimination of competition among retailers. In support of that proposition various reasons are given: (1) that fair-traded items carry unreasonably high profit margins; (2) they sell for less in nonfair-trade states; and (3) they are carried by dealers who go outside their field to get the advantage of high profits, e.g., grocers carry drugstore items; (4) that only 5 to 15 per cent of merchandise is fair traded anyway, so it has no substantial effect in stabilizing business.

It is further suggested that it is unrealistic to claim that most of the "fair traded" products are in "free and open competition with commodities of the same general class." The vast sums of money spent for advertising such products are purposed to convert the public that there is no other item of similar quality or character. Therefore, if the consumer believes this advertising, he cannot shop around for another such item at a lower price. If he desires to buy the product, he has no alternative but to pay the price set by the manufacturer.

It is also plausibly argued that instead of being a boon to small retailers as plaintiff argues, the Fair Trade Act is actually

28. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442.
29. For a summary of the arguments for and against fair trade see House and Senate Reports on the McGuire Act (Federal Fair Trade Act) of 1952, H.R. 1437, S.R. 1741, 82nd Congress, 1952.

detrimental to them in that it prevents them from getting ahead by efficient operation. That is, by assuring price and profit, it encourages additional retailers to enter the field, spreading the income thinner among dealers. It is reasoned that the public should not have to bear the additional cost of supporting more retailers, but if business gravitates to more efficient ones who can sell at lower prices, the public should have the benefits of this efficiency.

Another such argument is that of the three major groups affected by fair trade—the manufacturers, the retailers, and the public—it is neither the manufacturer, nor the public, who presumably would be benefited by the act, but for the most part, it is the retailers and their organizations which are the active force behind the whole fair trade movement, and have persistently sponsored and supported such acts.[30] These observations are borne out in the instant case. The retailers of this state submitted an amicus curiae brief supporting the act; their counsel claimed in argument that they were voicing the opinions of "virtually all of the retailers of the state, both large and small." To further emphasize the point that the true purpose of the laws is to protect the retailer and not the manufacturer, it is pointed out that General Electric and other manfacturers set fair-trade prices on certain of their goods but not on others. The question is asked: If the protection of good will is so vital, why does not the manufacturer fair trade all of his products?

Extensive studies have been made upon the subject and numerous articles have been written thereon indicating sharp differences of opinion as to the conclusions to be drawn.[31] Some eminent writers have corroborated the idea that in actual effect it is a price-fixing statute limiting competition at the retail level. Even the Federal

30. The National Association of Retail Druggists, besides organizing the Bureau of Education on Fair Trade, claims credit for the passage of the state fair trade acts and the Miller-Tydings Amendment. It also conducted a large scale lobbying program towards the enactment of the McGuire Bill. Fulda, Resale Price Maintenance, 21 U.Chi.L.Rev. 175, 180. The other prominent organizations behind the fair trade laws were The American Fair Trade League, The American National Retail Jewelers Association, The National Association of Retail Grocers of the U. S., The American Optical Association, The National Retail Hardware Association. Report of the Federal Trade Commission, "Resale Price Maintenance," (1945). See also Shulman, The Fair Trade Acts and the Law of Restrictive Agreements Affecting Chattels, 49 Yale L.J. 607; Grether, Price Control Under Fair Trade Legislation (1939); Stedman, Pitfalls in the Fair Trade Laws, Wis.Bar Bulletin (Dec.1955).

31. Fulda, Resale Price Maintenance, 21 U. Chi.L.R. 175. (It is argued that fair trade is but a device to conceal price fixing and limitation of competition between retailers. Shulman, the Fair Trade Act and the Law of Restrictive Agreements Affecting Chattels, 49 Yale L.J. 607.) See also 61 Yale L.J. 38; 46 Ill.L.R. 349; 63 Harvard L.R. 546. The Case for Fair Trade, Spencer L. Kimball and Sanford H. Kadish, U. of Utah Law School, appendix to plaintiff's brief lists numerous writings on this subject.

Trade Commission and the U. S. Department of Commerce have expressed opposite views, the Trade Commission opposing fair trade [32] and the Department of Commerce favoring it.[33]

The most recent of such studies coming to our attention is that made during the past year by a committee on antitrust laws appointed by the U. S. Attorney General. It stated as part of its conclusions that Fair Trade Laws are violative of the spirit and purpose of the Anti-Trust laws and a departure from the national Anti-Trust policy without commensurate gains. And further, that (1) the acts go beyond the necessity of "loss leader" control, (2) tend to prevent passing on to the consumer the savings from competitive distribution, and (3) may be used as a device to protect distributors from price competition and to maintain the price on such products.[34] These same views were reflected in the report of the Department of Justice in 1954. In response to a request as to the desirability of the passage of such an act for the District of Columbia, they advised against the act.

A number of states, admittedly a minority, have on various grounds stricken down such statutes.[35] However, it is significant that after some years of experience under the acts and numerous comprehensive studies covering the economic effects, the administration, and the enforcement of such laws, the majority of the more recent decisions have declared the acts invalid. Since 1952, of the jurisdictions considering the issue for the first time, only four states have upheld them,[36] while eight have found them uncon-

32. Rep. of Fed.Trade Com. on resale price maintenance 1945.
33. Hearings before U. S. Senate Committee on Commerce on H.R. No. 5767, 82nd Congress, 2nd Session, p. 9, 1952.
34. Report of Attorney General's National Committee to Study Anti-Trust Laws, pp. 153–154 (1955).
35. Five states so decided primarily on the grounds that the acts violate the due process clause of their respective state constitutions or are not within the police power. Ark., Union Carbide & Carbon Corp. v. White River Dist., 1955, 224 Ark. 558, 275 S.W.2d 455; Colo., Olin Mathieson Chemical Corp. v. Francis, Colo., 301 P.2d 139; Ga., Grayson Robinson Stores, Inc., v. Oneida, 1953, 209 Ga. 613, 75 S.E.2d 161; Mich., Shakespeare Co. v. Lippman's Tool Shop, 1952, 334 Mich. 109, 54 N.W.2d 268; Neb., McGraw Electric Co. v. Lewis & Smith Drug Co., 1955, 159 Neb. 703, 68 N.W.2d 608. Florida: Bristol Myers Co. v. Webb's Cut Rate Drug, 1939, 137 Fla. 508, 188 So. 91. "Voluntary contracts" in title held misleading. Liquor Stores, Inc., v. Continental Dist. Corp., Fla.1949, 40 So.2d 371. No purpose within the police power. Seagram Distillers Corp. v. Ben Greene, Inc., Fla.1951, 54 So.2d 235; Miles Laboratories v. Eckerd, Fla., 73 So.2d 680. Two states have found an improper delegation of legislative function. La., Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Bro. Giant Super Markets, La., 90 So.2d 343; Or., General Electric Co. v. Wahle, Or.1956, 296 P.2d 635. Virginia: Act declared invalid as conflicting with later amendment of antimonopoly statute; Benrus Watch Co. v. Kirsch, 1956, 198 Va. 94, 92 S.E.2d 384.
36. Mass., N.J., Ohio and Pa. See note 14, supra.

stitutional.[37] The Supreme Court of Florida has forthrightly declared that in its opinion, "the real effect of the non-signer clause is anti-competitive price fixing; not the protecting of the good will of trademarked products." [38] Justice Tooze of Oregon in an opinion comprehensively treating this subject, similarly concluded.[39]

It is difficult to even talk about the effect of this act without using the term "price fixing" or its equivalent. Witness our own case of Burt v. Woolsulate,[40] relied on by plaintiff to support the contention that the statute is not price fixing. In that case, speaking through Justice Wolfe, it was recited:

> "The Fair Trade Act *was never designed to permit* the regulation and *control of prices* for which the manufacturer or producer could sell his product. * * * [it] does not establish any prices. *It merely permits* manufacturers who desire to do so to enter into contracts designed to *control the prices* at which the products of said manufacturer can be resold * * *." (Emphasis added.)

It should be noted that the validity of the Fair Trade Act was not in question and that the above statement was dicta. Similarly characterizing the acts as price fixing, is the language of the U. S. Supreme Court in Schwegmann v. Calvert Distillers Corp.,[41] speaking through Mr. Justice Douglas, in which he refers to such legislation as permitting the "blanketing a state with resale price fixing if only one retailer wanted",[42] and also referring to it as "price fixing by compulsion",[43] but giving sanction thereto because of the provisions of the McGuire Act.

We have set forth the foregoing, not for the purpose of indicating that we agree or disagree with such arguments, because it is not necessary for us to pass on the merits of fair trade. They are set out to demonstrate that there is substantial disagreement as to the effect of the Fair Trade Acts, and that because of the complexity and ramifications of this subject, there are no firm foundations upon which definite conclusions can be based. In the words of plaintiff's own counsel, "It is impossible to state a definite case for fair trade which precludes the possibility of controversy. In matters of economic policy the paucity of scientific data and the pertinence of valued judgments preclude definite answers."

37. Ark., Colo., Ga., La., Mich., Neb., Or., and Va. See note 35, supra.
38. Miles Lab., Inc., v. Eckerd, Fla., 73 So. 2d 680, 682.
39. General Electric v. Wahle, Or.1956, 296 P.2d 635. See also expressions in other cases holding act unconstitutional, note 35, supra.
40. 106 Utah 156, 146 P.2d 203, 204.
41. 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035.
42. Ibid. 341 U.S. at page 390, 71 S.Ct. at page 748.
43. Ibid. 341 U.S. at page 388, 71 S.Ct. at page 747.

In view of the inconclusiveness of the arguments as to the effect of the Fair Trade Act in its relationship to the constitutional provision, there appears to be no justification for judicial interpretation of the Fair Trade Act in accordance with plaintiff's contention.

It cannot be gainsaid, in fact plaintiff concedes, that retailers of this state could not lawfully enter into voluntary contracts with each other to fix prices of plaintiff's products, because that would be price fixing on a "horizontal" basis. However, even though they may not so deal with each other, the act furnishes them a device by which they can readily combine to fix prices by the use of the producer or manufacturer as an intermediary. The manufacturer and one dealer, by the use of the so-called "vertical" price fixing arrangement, can bind all retailers in the state into a compact to sell goods at a set price, thus forcing them into a combination expressly forbidden by the Constitution.[44]

The difficulty with the type of "price fixing" here in question, even if it were for the salutary purposes contended by the plaintiff, whether it be a little or a lot, is that it is a violation of our Constitution. It is like sin: a little sin, if properly so classified, is just as definitely sin as a great quantity of it, and hardly to be approved under the pretext that it is so small in amount that it can really be regarded as a virtue.

■■ Although we are aware of the fact that all doubts should be resolved in favor of constitutionality,[45] it nevertheless appears from the interdiction against any "combination * * * having for its object or effect the controlling of the price * * * of any article of manufacture * * *" that the framers simply did not want price fixing by any combination. We see no reason which would impel us to ignore nor to vary from the plain import of the words of the Constitution,[46] even though events may have occurred which probably were not foreseen at the time the provision was adopted.[47] We do not regard the situation here presented as involving the regulation of prices where the public health, morals or welfare may be affected and the question of legislative police power under such circumstances is not here dealt with.[48]

■ Regardless of whatever forms or rituals are gone through to accomplish the purpose of establishing retailers' prices, or of any conjecture about the purpose of the legislation, the indisputable fact is that

44. Compare language of Justice Douglas in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. at page 389, 71 S. Ct. at page 748.

45. Newcomb v. Ogden City Public School, Utah, 243 P.2d 941.

46. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442.

47. See 50 Am.Jur., p. 224.

48. See Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L. Ed. 940; 16A C.J.S., Constitutional Law, § 690.

insofar as the nonsigning merchant and the public are concerned, the act so operates that the agreement of the manufacturer and one dealer does establish the price at which the manufacturer's product must be sold by all retailers within the area. Therefore, in its basic essence it must be regarded as "price fixing" and for that reason the act is invalid under Sec. 20, Article XII of our Constitution. Having so decided, it is unnecessary for us to consider the other bases of attack: that the act is discriminatory, denies equal protection of the laws, constitutes an unlawful delegation of legislative power and is broader than its title.

Affirmed. Costs to respondent.

McDONOUGH, C. J., and HENRIOD, WADE and WORTHEN, JJ., concur.